# United States Court of Appeals for the Federal Circuit

04-5012

STEPHEN S. ADAMS and 14,302
other similarly situated plaintiffs,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Richard P. Bress, Latham & Watkins LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was J. Scott Ballenger and Nathaniel A. Vitan, Of counsel on the brief were Jules Bernstein and Linda Lipsett, Bernstein & Lipsett, of Washington, DC; and Edgar James, James & Hoffman, of Washington, DC.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director.

Michael E. Malamut, New England Legal Foundation, of Boston, Massachusetts, for amicus curiae New England Legal Foundation.

Lawrence Berger, Mahon & Berger, of Garden City, New York, for amicus curiae Federal Law Enforcement Officers Association.

Appealed from: United States Court of Federal Claims

Judge Lawrence J. Block

# United States Court of Appeals for the Federal Circuit

04-5012

STEPHEN S. ADAMS, and 14,302 other similarly-situated plaintiffs,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  December 9, 2004

_____

Before MICHEL, RADER, and PROST, Circuit Judges.

MICHEL, Circuit Judge.

Stephen S. Adams and 14,302 other similarly-situated individuals (collectively, "Appellants") were employed between 1984 and 1995 as GS-9, GS-11, GS-12, and GS-13 criminal investigators in various federal law enforcement agencies, including the Bureau of Alcohol Tobacco and Firearms ("BATF"), the Drug Enforcement Agency ("DEA"), the Internal Revenue Service ("IRS"), the United States Customs Service ("Customs Service"), and the United States Secret Service ("USSS").[1]  They appeal from the order of the United States Court of Federal Claims granting the Government's

_____

[1] Several of those agencies or units thereof have since been renamed and/or merged into the United States Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat. 2135, 2308 (2002)).

motion to dismiss their takings complaint for failure to state a claim upon which relief may be granted. Adams v. United States, No. 00-447C, 2003 U.S. Claims LEXIS 238 (Fed. Cl. Aug. 11, 2003). Appellants received overtime compensation, apparently pursuant to the Federal Employees Pay Act ("FEPA"), codified at 5 U.S.C. § 5542, at a rate less than one-and-one-half times their regular rate of pay.[2] Appellants assert entitlement to overtime compensation at the rate specified under the Fair Labor Standards Act ("FLSA"), codified at 29 U.S.C. §§ 201-219, which is at least one-and-one-half times their regular rate of pay, rather than at the lower rate provided for in the FEPA. In other words, Appellants seek to recover as damages the difference between what they received under the FEPA versus the amount they would have received under the FLSA ("underpaid overtime compensation"). The case was submitted for decision after oral argument on September 7, 2004. Because Appellants do not have a cognizable property interest in either the underpaid overtime compensation or in an administrative claim thereto within the meaning of the Takings Clause of the Fifth Amendment, we affirm.

## I.    BACKGROUND

### A.    Statute of Limitations Applicable to FLSA Claims

The FLSA provides overtime compensation to certain employees who work more than forty hours per week at a rate not less than one-and-one-half times the employees' regular rate of compensation. This statute originally did not cover federal employees. In 1974, however, Congress extended it to federal employees, but exempted those classified as executive, administrative, or professional. Id. § 213(a)(1).

---

[2]    The parties fail to analyze the specific provision under which Appellants received compensation for overtime work. Nevertheless, the Government cited the

To recover unpaid overtime compensation under the FLSA, a federal employee may file either an action at law or a claim before the General Accounting Office ("GAO"). Actions at law brought under the FLSA are subject to the statute of limitations provided in the Portal-to-Portal Pay Act, codified at 29 U.S.C. §§ 251-262, which provides for a two-year limitations period for cases in which the FLSA violation is non-willful and a three-year period where the violation is willful. Id. § 255(a).

The statute of limitations for administrative claims before the GAO initially was selected, then revised by, the Comptroller General of the United States and twice altered by Congress. The numerous changes in the statute of limitations for claims before the GAO, in part, create the backdrop of the instant takings claim. Therefore, it is important to have a general understanding of the evolution of the limitations periods involved.

In 1978, the Comptroller General ruled that the statute of limitations for FLSA claims before the GAO was not the statutory period specific to FLSA claims, but was six years as set forth in the more generally applicable Barring Act, codified at 31 U.S.C. § 3702(b). In re Transp. Sys. Ctr., 57 Comp. Gen. 441 (1978). Sixteen years later, on May 24, 1994, the Comptroller General effectively changed the statute of limitations for FLSA claims before the GAO from six years to two years for non-willful violations and three years for willful violations, essentially recognizing as applicable the limitations period specifically set for FLSA claims in the Portal-to-Portal Pay Act. In re Ford, 73 Comp. Gen. 157 (1994).

Shortly thereafter, on September 30, 1994, Congress enacted the Treasury, Postal Service and General Government Appropriations Act of 1995, Pub. L. No.

---

FEPA in its brief, a citation that was not contradicted in Appellants' reply brief.

103-329, 108 Stat. 2383, 2432 (1994). Section 640 of that act mandated that the Comptroller General apply a six-year statute of limitations period to any administrative claim under the FLSA filed prior to June 30, 1994, and a two-year statute of limitations period to any such claim filed after June 30, 1994.

On November 19, 1995, Congress enacted the Treasury, Postal Service, and General Government Appropriations Act of 1996, Pub. L. No. 104-52, 109 Stat. 468, 468-69 (1995), which amended Section 640 to further limit the types of FLSA claims that may be decided by the GAO ("amended Section 640"). Amended Section 640 precluded, among other changes, application of the six-year statute of limitations originally set forth in Section 640 to employees who had received overtime compensation under another provision of law. Thus, those employees were limited to the two-year statute of limitations period.

## B. Appellants' Status Under the FLSA

Pursuant to 5 C.F.R. § 551.201, the BATF, the DEA, the IRS, the Customs Service, and the USSS independently determined, as the respective employing agencies, that Appellants were administrative employees exempt from the FLSA and its overtime provisions. In making this determination, the employing agencies evaluated whether Appellants' duties met the administrative exemption criteria set forth in 5 C.F.R. § 551.206. Significantly, Appellants were presumed to be non-exempt under the civil service regulations, thereby requiring the employing agencies to carry the burden of establishing that the Appellants met the criteria of § 551.206. Id. §§ 551.202(a), (c).

Dissatisfied with this exemption determination, Appellants filed an action at law under the Tucker Act, codified at 28 U.S.C. § 1491, against the Government in the

United States Court of Federal Claims. Simultaneously, Appellants filed identical administrative claims before the GAO. In both proceedings, Appellants alleged that they were improperly ruled exempt from the FLSA and were entitled to damages flowing from this misclassification. In a decision dated October 30, 1992, the Court of Federal Claims concluded that some of the Appellants were exempt, while others were non-exempt. Adams v. United States, 27 Fed. Cl. 5, 28-29 (Fed. Cl. 1992).

On September 23, 1998, we partially reversed the Court of Federal Claims' ruling in a non-precedential opinion and remanded the case for further proceedings as to those criminal investigators held exempted from the FLSA. Adams v. United States, No. 98-5011, 1998 U.S. App. LEXIS 23565 (Fed. Cir. Sept. 23, 1998) (Table). That case remains pending before the Court of Federal Claims.

**C.     Prior Court Proceedings Leading to the Instant Appeal**

On October 27, 1995, prior to the enactment of amended Section 640, Appellants filed suit against the Government in the United States District Court for the District of Columbia, seeking mandamus, injunctive, and declaratory relief against the GAO for its inactivity on their administrative claims. Following the enactment of amended Section 640, Appellants twice supplemented their complaint to challenge the constitutionality of original Section 640 and amended Section 640 under the Due Process and Takings Clauses of the Fifth Amendment.

On October 12, 1996, the district court granted summary judgment in favor of the Government. Adams v. Bowsher, 946 F. Supp. 37 (D.D.C. 1996). The district court addressed Appellants' due process arguments, ultimately concluding that neither Section 640 nor amended Section 640 violated the Due Process Clause. As to Appellants' takings claim, the district court concluded that a compensable taking did not

04-5012                                                    5

occur, based upon the three factors set forth for regulatory takings in Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-25 (1986). Adams, 946 F. Supp. at 44. Appellants appealed that decision to the United States Court of Appeals for the District of Columbia Circuit.

On August 28, 1998, the District of Columbia Circuit affirmed the district court's decision on the due process claim, but reversed its decision on Appellants' takings claim. Adams v. Hincher, 154 F.3d 420 (D.C. Cir. 1998). The circuit court noted that takings claims for amounts greater than $10,000 fall within the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act. Id. at 425-426. Consequently, the circuit court concluded that the district court might lack jurisdiction to entertain Appellants' takings claim and remanded the takings claim to the district court to determine whether jurisdiction was proper under the Little Tucker Act, codified at 28 U.S.C. § 1346(a)(2), for claims of less than $10,000, which lodges concurrent jurisdiction in the district courts.

On March 30, 2000, the district court issued an opinion answering the jurisdictional question posed by the circuit court. Adams v. Walker, No. 95-2015 (D.D.C. Mar. 30, 2000). The district court noted that Appellants sought to amend their complaint to allege an amount in controversy in excess of $10,000. The district court stated that the circuit court "essentially rejected [Appellants'] claim for injunctive relief and viewed it instead as a claim for money damages." Id., slip op. at 5. Hence, the district court concluded that justice required it to allow Appellants to amend their complaint and, therefore, to transfer the case to the Court of Federal Claims. Id., slip. op. at 6. The district court thus vacated its ruling concerning Appellants' takings claim

and ordered the case transferred to the Court of Federal Claims pursuant to the transfer provision in 29 U.S.C. § 1631. Id., slip. op. at 9.

### D. The Court of Federal Claims Decision

On August 4, 2000, after transfer from the district court to the Court of Federal Claims, Appellants' complaint claimed that three separate governmental actions effected a taking of their property under the Fifth Amendment: (1) the Comptroller General's Ford decision that retroactively applied a two- or three-year statute of limitations to their administrative claims instead of the six-year statute of limitations; (2) the GAO's failure and refusal in the intervening year to apply the original Section 640 to their administrative claims; and (3) Congress's amendment of Section 640 in late 1995 restricting restoration of the six-year limitations period to situations where no overtime was paid at all. In response, the Government asserted that Appellants' case is merely a standard FLSA entitlement case disguised as a Fifth Amendment takings claim. Put differently, the Government argued that Appellants' claim is one for statutory entitlement under the FLSA because the only property allegedly taken was FLSA overtime compensation. The Government also argued that a claim to FLSA overtime compensation is not "property" within the meaning of the Takings Clause, and subsequently moved to dismiss the complaint under Court of Federal Claims Rule 12(b)(6) for failure to state a claim upon which relief can be granted and Court of Federal Claims Rule 12(b)(1) for lack of jurisdiction over the subject matter of the case.

The trial court distilled the parties' arguments to a single issue: whether Appellants' claim involves "property" within the meaning of the Takings Clause of the Fifth Amendment. Adams, 2003 U.S. Claims LEXIS 238 at *20. To address that issue, the trial court considered Appellants' claim for underpaid overtime compensation

separate from Appellants' administrative claim. Relying on <u>Commonwealth Edison Co.</u> <u>v. United States</u>, 271 F.3d 1327 (Fed. Cir. 2001) (en banc), the trial court held that a governmental obligation to pay money pursuant to a statute is not a protected "property" interest under the Takings Clause. <u>Adams</u>, 2003 U.S. Claims LEXIS 238 at *20. In reaching that holding, the trial court focused its analysis on the identification of a true property interest but concluded that "[a]ll the [appellants] have identified is a run-of-the-mill claim for liability." <u>Id.</u> at *27. Additionally, the court reasoned that even if a statutory right to payment could be considered "property," the Government had not "taken" Appellants' money for its own use; it simply did not pay them because it determined after analysis that they were exempt from the FLSA. <u>Id.</u> at *30.

As for Appellants' administrative claim, the court observed that the abolition of a cause of action may rise to the level of a taking, but only if the cause of action secures a "legally protected interest." <u>Id.</u> at *40. For that reason, the court concluded that Appellants' administrative claim also must fail, since the interest underlying this claim is not cognizable as a property right protected by the Takings Clause of the Fifth Amendment. <u>Id.</u> Moreover, the court noted that the district court and District of Columbia Circuit already had rejected Appellants' due process claims. <u>Id.</u> The court concluded, therefore, that no cause of action to protect Appellants' property or procedural rights had been unconstitutionally taken from them. <u>Id.</u> at *41. Accordingly, the Court of Federal Claims granted the Government's motion to dismiss and ordered entry of final judgment in favor of the Government.

Appellants timely appealed, arguing that the Court of Federal Claims erred in deciding that they did not have a property interest in either FLSA overtime compensation, or an administrative claim thereto, cognizable under the Takings Clause.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) because the appeal is from a final judgment of the Court of Federal Claims.

## II. DISCUSSION

### A. Standard of Review

The Court of Federal Claims did not explicitly state whether the motion to dismiss was granted under Rule 12(b)(1) or under Rule 12(b)(6) of the Rules of the Court of Federal Claims. Nevertheless, it appears that the Government did not present an exclusively jurisdictional argument, which would invoke Rule 12(b)(1). Additionally, the Court of Federal Claims focused on the merits of Appellants' case in its opinion. Therefore, the Court of Federal Claims can best be described as having granted the motion to dismiss under Rule 12(b)(6) of the Court of Federal Claims for failure to state a claim on which relief can be granted.[3]

Dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is proper only when a plaintiff "'can prove no set of facts in support of his claim which would entitle him to relief.'" Leider v. United States, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In reviewing the Court of Federal Claims' grant of a Rule 12(b)(6) motion, we must assume that all well-pled factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-movant. See Leider, 301 F.3d at 1295. Whether the Court of Federal Claims properly dismissed Appellants' complaint for failure to state a claim upon which relief can be granted is a question of law which we review de novo. See id. (citing Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000)).

---

[3] Rule 12 of the Court of Federal Claims mirrors Rule 12 of the Federal Rules of Civil Procedure.

**B.     The Takings Clause**

The Takings Clause of the Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation."    U.S. Const. amend. V, cl. 4.   A claimant under the Takings Clause must show that the government, by some specific action, took a private property interest for a public use without just compensation.   Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294 (1981).   In evaluating a takings claim, we have developed a two-step approach.   First, we determine whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment, i.e., whether the claimant possessed a "stick in the bundle of property rights."   Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citation omitted).   Second, once we have determined that such a property interest exists, we decide "whether the governmental action at issue constituted a taking of that 'stick.'"   Id. (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995)).

In this case, our analysis focuses on the threshold requirement of a recognized property interest, i.e., whether Appellants possessed any cognizable property interests within the meaning of the Takings Clause in either FSLA overtime compensation or in an administrative claim thereto.   The Constitution itself neither creates nor defines the property interests that if taken by the government are compensable under the Fifth Amendment.   Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).   Rather, "existing rules or understandings that stem from an independent source," such as state, federal, or common law, create and define the dimensions of property interests for purposes of establishing a cognizable right and hence a potential taking.   Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992).   We have observed:

> Property interests are about as diverse as the human mind can conceive. Property interests may be real and personal, tangible and intangible, possessory and nonpossessory. They can be defined in terms of sequential rights to possession (present interests — life estates and various types of fees — and future interests), and in terms of shared interests (such as those of a mortgagee, lessee, bailee, adverse possessor), and there are interests in special kinds of things (such as water, and commercial contracts). And property interests play across the entire range of legal ideas.

Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1572 n.32 (Fed. Cir. 1994). In light of the complex nature of property interests and associated rights, we must identify the precise nature of Appellants' takings claim on appeal. Appellants argue, as they did before the Court of Federal Claims, that two specific property interests are implicated, namely, an interest in payment of underpaid overtime compensation according to FLSA rates and an interest in an administrative claim thereto before the GAO. We consider each of these alleged property interests in turn.

### i. Do Appellants Possess a Cognizable Property Interest in Their Asserted Right to Underpaid Overtime Compensation According to FLSA Rates?

Appellants argue that as of November 18, 1995, they possessed a valid claim against the Government for six years of underpaid overtime compensation. Appellants contend that when Congress amended Section 640 on November 19, 1995, reducing the limitations period for certain claims from six to two years, the Government confiscated via a per se taking four years of their claim for underpaid overtime compensation under the FLSA without just compensation.

Appellants assert that vested property rights may be created by either statute or contract, proceeding on both theories in the alternative. Focusing first on statutory grounds, Appellants contend that they acquired property rights in underpaid overtime compensation under the FLSA for six previous years because such rights vested at the

04-5012                                    11

end of each pay period during which they worked hours of overtime, and the statute of limitations was six years. Appellants assert that the Government was obligated as a matter of law to pay them for these overtime hours at the FLSA rate (i.e., at least one-and-one-half times their regular rate), not at any lesser rate under the FEPA or any other statute. As examples of cases that recognize property interests and derivative rights created by statute, Appellants cite United States v. Larionoff, 431 U.S. 864 (1977), Zucker v. United States, 758 F.2d 637 (Fed. Cir. 1985), and Kizas v. United States, 707 F.2d 524 (D.C. Cir. 1983).

We disagree that Appellants own any Fifth Amendment property interest pursuant to the FLSA statute. Appellants confuse a property right cognizable under the Takings Clause of the Fifth Amendment with a due process right to payment of a monetary entitlement under a compensation statute.[4] Larionoff, Zucker, and Kizas are inapposite because each involves enforcing a statutory entitlement to compensation for employment, not recognizing the predicate for a takings claim. In Larionoff, the Supreme Court considered a soldier's entitlement to a reenlistment bonus under the statutory Variable Reenlistment Bonus Program. 431 U.S. at 866. Similarly, in Zucker, we decided civil servant retirees' entitlement to cost-of-living-adjustments under the Civil Service Retirement Act, while in Kizas, the United States Court of Appeals for the District of Columbia Circuit addressed FBI agents' entitlement to a "special preference"

---

[4] Generally, entitlements are considered to be government conferred benefits, safeguarded exclusively by procedural due process. See Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). In light of this, entitlements are often referred to as "property interests" within the meaning of the Due Process Clause in cases decided under that clause, but such references have no relevance to whether they are "property" under the Takings Clause.

as an element of compensation under Title 5 of the United States Code. Zucker, 758 F.2d at 639-40; Kizas, 707 F.2d at 534-38.

Appellants alternatively contend that the assertedly applicable FLSA rate of overtime compensation became a contractual right once the work was completed. Appellants rely on a passage from Fisk v. Jefferson Police Jury, 116 U.S. 131 (1885), to support that contention: "But after the services have been rendered, under a law, resolution, or ordinance which fixes the rate of compensation, there arises an implied contract to pay for the services at that rate. This contract is a completed contract." Id. at 133-34. Pursuing a contract theory, Appellants contend that they acquired vested property rights to the underpaid overtime compensation via an implied contract with the Government formed when they completed the overtime work. For support, Appellants cite to selected cases, such as Lynch v. United States, 292 U.S. 571 (1934), wherein courts have found that sometimes rights arising out of a contract can be protected by the Takings Clause of the Fifth Amendment.

Appellants' contract theory is without merit. At the outset, Appellants mischaracterize Fisk. The plaintiff in Fisk served as a Louisiana parish district attorney by appointment, and a municipal law fixed his salary. When the Parish of Jefferson failed to pay his salary for four years, plaintiff sued in state court for recovery, requesting a writ of mandamus to compel the parish to assess and collect a tax for the payment of his salary. The Supreme Court of Louisiana denied the writ based upon a provision of the Louisiana Constitution limiting the power to levy a tax. The plaintiff sought review in the United States Supreme Court, arguing that the Louisiana constitutional provision impaired the obligation of his contract as guaranteed by the

Contract Clause of the United States Constitution. <u>Fisk</u>, 116 U.S. at 133. The United States Supreme Court agreed, concluding that

> [the plaintiff's] appointment as district attorney was lawful and was a request made to him by the proper authority to render the services demanded of that office. He did render these services for the parish, and the obligation of the police jury to pay for them was complete. Not only were the services requested and rendered, and the obligation to pay for them perfect, but the measure of compensation was also fixed by the previous order of the police jury. There was here wanting no element of a contract.

<u>Id.</u> at 134. Thus, <u>Fisk</u> involved an unconstitutional provision of state law and was decided under the Contracts Clause, not the Takings Clause.

Appellants cite no case law to show that either the United States Supreme Court or this court would view a takings claim against the United States in the same light. Like all federal employees, Appellants served by appointment. The terms of their employment and compensation, consequently, were governed exclusively by statute, not contract. They had not, and could not have, entered into any separate agreement with the Government, express or implied, for additional overtime compensation beyond that to which they were entitled by the applicable statute. Hence, contrary to Appellants' characterization of their entitlement to underpaid overtime compensation as based on an implied contract, Appellants had nothing more than a unilateral expectation to receive FLSA, rather than FEPA, overtime compensation for their hours of overtime work. Indeed, the District of Columbia Circuit previously recognized that

> federal workers serve by appointment, and their rights are therefore a matter of legal status even where compacts are made. In other words, their entitlement to pay and other benefits must be determined by reference to the statutes and regulations governing [compensation], rather than to ordinary contract principles. Though a distinction between appointment and contract may sound dissonant in a regime accustomed to the principle that the employment relationship has its ultimate basis in contract, the distinction nevertheless prevails in government service.

> Applying these doctrines, courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel. These cases have involved, <u>inter alia</u>, promises of appointment to a particular grade or step level, promises of promotion upon satisfaction of certain conditions, promises of extra compensation in exchange for extra services, and promises of other employment benefits.

<u>Kizas</u>, 707 F.2d at 535 (citations and internal quotations omitted).

Furthermore, Appellants' reliance on <u>Lynch</u> is misplaced. In <u>Lynch</u>, despite the government having duly issued the insured a lawful insurance policy, Congress abrogated by legislation all such policies in force. Here, unlike in <u>Lynch</u>, the Government did not enter into any private agreement with Appellants regarding the terms or rates of Appellants' overtime compensation, and Congress did not abrogate any such contract. The Government, in fact, could not have contracted to pay Appellants for overtime work at a rate of at least one-and-one-half their regular rate of pay because, like all government employees, Appellants' compensation is governed exclusively by statute. Consequently, as previously stated, Appellants cannot be contractually entitled to overtime compensation at the rate specified under the FLSA or any other pay statute. When the Government and private parties contract, as in <u>Lynch</u>, the private party usually acquires an intangible property interest within the meaning of the Takings Clause in the contract. The express rights under this contract are just as concrete as the inherent rights arising from ownership of real property, personal property, or an actual sum of money. Here, no contract established in Appellants a property interest in overtime compensation at a particular rate under the FLSA. Because Appellants cannot show that they had a contract with the Government, they are not entitled to Takings Clause protection under <u>Lynch</u>.

Extending its contract theory, Appellants particularly equate the Government's alleged statutory obligation to pay them overtime compensation at the FLSA rate with a debt owed by a debtor to a lender. They use the word "debt" repeatedly, but they distort the meaning of this word. That is, Appellants claim that when they performed the overtime work, the Government incurred a debt commensurate with paying them for their labor at the FLSA rate, not a lesser rate under an alternative overtime pay statute. Appellants contend, in turn, that paying this "debt" is akin to paying the insurance policy proceeds in Lynch or the gold standard bonds in Perry v. United States, 294 U.S. 330 (1935).

Appellants' argument is wholly unpersuasive. In Lynch, an insured purchased a war insurance policy from the United States, effectively lending money to the Government in exchange for future payment on the value of the policy at the time of the insured's death. 292 U.S. at 574-75. Likewise, in Perry, the bond owner purchased a gold bond from the United States, also in effect lending money to the Government in exchange for payment of the principal amount of the bond plus interest in gold coins. 294 U.S. at 346-47. In both cases, the Government agreed with the lenders, i.e., the insured and the bond owner, to make future payment of either the policy amount in the case of a war insurance policy or the bond principal plus interest in the case of the gold bond in exchange for the immediate use of their money. Also, the Government's "debt" to the insured and the bond owner was evidenced in a legal instrument issued by the Government to acknowledge and create the debt, respectively an insurance policy and a bond certificate. Here, as stated above, the Government and Appellants did not, and could not have, agreed that the Appellants would "loan" their underpaid overtime compensation to the Government in exchange for a "debt" owed by the Government to

them. Additionally, the Government issued no underlying legal instrument evidencing the Government's agreement to a loan. The only legal instrument, the Form 50, rather than acknowledging Appellants' right to be paid for overtime at the rate specified in the FLSA, instead indicated that the FLSA did not apply to them. Thus, Appellants are not in the same position as the insured and bond holder in <u>Lynch</u> and <u>Perry</u>, but instead are in the opposite position. Accordingly, as the Government argues, Appellants are not owed a debt; they have nothing more than a bald allegation that they are owed underpaid overtime compensation by the Government.

Lastly, Appellants argue that the Court of Federal Claims misunderstood and misapplied our <u>Commonwealth Edison</u> decision. Appellants assert that this court in <u>Commonwealth Edison</u> did not intend to suggest by using the phrase "specific fund of money"[5] that the Takings Clause applies only when a particular sum or account is at stake. Rather, Appellants contend that this court used the phrase merely to distinguish between an obligation imposed by the Government to pay money to achieve a regulatory objective, as in that case, and confiscation of specific money by the Government, as in a classic <u>per se</u> taking, which Appellants argue occurred here.

---

[5]     The phrase "fund of money" as used in <u>Commonwealth Edison</u> derives from Justice Breyer's dissent in <u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498 (1998). Justice Breyer stated:   "But the monetary interest at issue there [referring to <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155 (1980)] arose out of the operation of a <u>specific, separately identifiable fund of money</u>."   <u>E. Enters.</u>, 524 U.S. at 555 (emphasis added).

New England Legal Foundation ("NELF"), as amicus curiae,[6] advances a similar argument, going so far as to assert that the alleged underpaid overtime compensation is a "fund of money."  NELF reaches this position by advocating that "[t]he key to a 'fund of money' is that it must be 'specific' and 'separately identifiable,' not that it be kept in a separate account."  In other words, NELF appears to claim that as long as the money allegedly owed is both "specific" and "separately identifiable," then it qualifies as a protected "fund of money."  NELF contends that Appellants theoretically could calculate the amount of underpaid overtime compensation by multiplying the total number of overtime hours by the applicable overtime rate under the FLSA.  Accordingly, NELF asserts that the amount of underpaid overtime compensation due to Appellants is both "specific" and "separately identifiable," even if it is not maintained in a separate account by the Government.

The Government seeks to refute Appellants' and NELF's positions, arguing that the Court of Federal Claims was correct that an ordinary statutory obligation to pay money can never constitute property for purposes of the Takings Clause.  The Government asserts that Appellants and NELF plainly ignore the holding in Commonwealth Edison and attempt to distinguish that case based on differences between the facts there and those here that are immaterial.  Additionally, the Government claims that NELF fails to explain how the alleged underpaid overtime compensation is any more a "fund of money" than the obligation to pay money in Commonwealth Edison.  Indeed, the Government further contends the allegedly

---

[6]   The Federal Law Enforcement Officers' Association ("FLEOA") also presented an amicus curiae brief in support of Appellants' position.  However, the FLEOA did not address the substance of a takings analysis, but instead focused primarily on the unfairness of not granting Appellants' relief.

underpaid overtime compensation here is even less a "specific" and "separately identifiable" fund than the monetary obligation in Commonwealth Edison.

Like the Government, we do not read Commonwealth Edison in the same light as either Appellants or NELF. In Commonwealth Edison, Congress imposed a monetary assessment in the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (codified as amended in various sections of 42 U.S.C.), on all domestic utilities such as Commonwealth Edison that used uranium re-processing facilities operated on their behalf by the United States Department of Energy. Under the Energy Policy Act, the Government was to use the revenue generated by the assessment to fund part of the cost of environmental remediation of its contaminated re-processing facilities. We held that Congress did not effect a taking within the meaning of the Fifth Amendment by imposing a statutory obligation to pay money on the utility companies. Commonwealth Edison, 271 F.3d at 1340. In reaching this conclusion, we followed the views of a majority[7] of the justices of the Supreme Court in Eastern Enterprises. Id. at 1338. In that case, the Supreme Court addressed the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, codified at 26 U.S.C. §§ 9701-9722 (the "Coal Act").

The Coal Act required certain coal mine operators to fund future health benefits of former coal mine employees of defunct companies, even though the paying, extant companies never employed them. Writing for the plurality, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas, concluded that the retroactive impact of the Coal Act as applied to Eastern Enterprises was an unconstitutional taking

---

[7] Notably, there was not a majority opinion of the Supreme Court in Eastern Enterprises. By referring to "a majority" view herein, we mean those views expressed in

because it placed a "severe, disproportionate and extremely retroactive burden" on the extant coal operators.  E. Enters., 524 U.S. at 538.  While concurring in the result, Justice Kennedy disagreed with the plurality's conclusion that an obligation to pay money can support a taking, because

> [the Coal Act] does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest.  The Coal Act does not appropriate, transfer, or encumber an estate in land (e.g., a lien on a particular piece of property), a valuable interest in an intangible (e.g., intellectual property), or even a bank account or accrued interest.  The law simply imposes an obligation to perform an act, the payment of benefits.

Id. at 540.  Indeed, the four dissenters, namely, Justices Stevens, Souter, Ginsburg, and Breyer, specifically "agreed that the Takings Clause was not implicated because 'the private property upon which the [Takings] Clause traditionally has focused is a specific interest in physical or intellectual property. . . . This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money.'"  Id. at 554.  We thus held in Commonwealth Edison that "the mere imposition of an obligation to pay money, as here, does not give rise to a claim under the Takings Clause of the Fifth Amendment."  Commonwealth Edison, 271 F.3d at 1340.  Given the precise language found in Justice Kennedy's concurrence and the dissent, we premised our holding in Commonwealth Edison not on whether the statutory obligation was imposed for purposes of regulation or confiscation as suggested by Appellants, but rather on the nature of the interest in dispute (i.e., a legally-recognized property interest such as one in real estate, personal property, or intellectual property, versus an ordinary obligation to

---

the concurring opinion of Justice Kennedy together with those expressed in the dissenting opinion of Justices Stevens, Souter, Ginsburg, and Breyer.

04-5012 20

pay money).  The former is protected as property under the Takings Clause, whereas the latter is not because it lacks any foundation in property law.

We also took care in Commonwealth Edison to distinguish the specific funds implicated in Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998), and Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980), as legitimate property interests from statutory obligations to pay money.  271 F.3d at 1338.  Particularly, we noted that each contributor's share of interest income generated by funds held in a specific, consolidated Interest on Lawyers Trust Account, commonly known as an IOLTA account, is the private property of that contributor for purposes of the Takings Clause.  See Phillips, 524 U.S. at 160.  Similarly, we observed that each contributor's share of interest generated from deposits into a specific, consolidated interpleader account is a property interest of that contributor within the meaning of the Takings Clause.  See Webb's Fabulous Pharmacies, 449 U.S. at 164-65.  In light of our use of the term "specific" to mean an actual sum of money representing interest derived from ownership of particular deposits in an established account, as opposed to some abstract sum of money capable of being calculated, NELF's argument cannot stand.

While it may be debatable to what extent the precise holding in Commonwealth Edison controls the instant case, this decision certainly provides the principle for determining how to treat the instant claim of a statutory entitlement to money under the Takings Clause.  Both the Government and the Court of Federal Claims correctly noted that Commonwealth Edison clearly suggests that no statutory obligation to pay money, even where unchallenged, can create a property interest within the meaning of the Takings Clause.  Here, in Appellants' claim that the Government is obligated to pay underpaid overtime compensation under the FLSA, we are faced with a statutory

obligation to pay money, just as was implicated in <u>Commonwealth Edison</u>.  Hence, based upon the principle of <u>Commonwealth Edison</u>, Appellants do not possess a property interest under the Takings Clause.

What is more, we conclude that a statutory right to be paid money, at least in the context of federal employee compensation and benefit entitlement statutes, is not a property interest for purposes of the Takings Clause.  Appellants have neither cited, nor are we independently aware of, any appellate court decision recognizing a statutory obligation to be paid money as a property interest grounded in property law.  We decline to treat a statutory right to be paid money as a legally-recognized property interest, as we would real property, physical property, or intellectual property.  Instead, we view it as nothing more than an allegation that money is owed. We thus conclude that Appellants cannot prove any set of facts that could support granting their requested relief.

ii.     **Do Appellants Possess a Cognizable Property Interest in an Administrative Claim to Underpaid Overtime Compensation Before the GAO?**

Appellants argue, but only in a cursory fashion, that as of November 18, 1995, they owned a valid administrative claim before the GAO to recover their unpaid overtime compensation.[8]  They contend that when Congress amended Section 640 on November 19, 1995, the Government entirely extinguished their administrative claim to underpaid overtime compensation, effecting a <u>per</u> <u>se</u> taking of their private property without just compensation.  Appellants rely on <u>Alliance of Descendants of Texas Land Grants v. United States</u>, 37 F.3d 1478 (Fed. Cir. 1984), to support their argument that their GAO claim, like certain causes of action, is "property" within the meaning of the Takings

Clause. What is more, Appellants maintain that it was immaterial that their claim had not yet been decided by the GAO when Section 640 was amended.

Although we agree with Appellants that sometimes a cause of action may fall within the definition of property recognized under the Takings Clause, we observe, like the Court of Federal Claims, that precedent has limited the application of the Takings Clause to cases in which the cause of action protects a legally-recognized property interest. See, e.g., Cities Serv. Co. v. McGrath, 342 U.S. 330 (1952) (holding that seizure by Alien Property Custodian of interest represented by bond or debenture without seizure of instrument itself is unconstitutional taking of obligor's property unless he is assured that he has claim against United States for recoupment in the event of subsequent recovery against him in foreign court by holder in due course of debenture). Such is not the case here because, as discussed in detail above, the underlying subject matter of Appellants' alleged administrative claim fails to qualify as a recognized property interest under the Takings Clause. Appellants' reliance on Alliance of Descendants is utterly misplaced because the cause of action there was to recover compensation for an interest in land, a property interest cognizable under established takings jurisprudence because land is, beyond question, property under state and common law. Alliance of Descendants, 37 F.3d at 1481. Appellants have not cited any precedent finding such a property interest in a claim of Government liability before an administrative agency. Hence, we conclude that Appellants do not possess a cognizable property interest in any part of their administrative claim before the GAO.

### iii. Per Se Takings Argument

---

[8]    Appellants devoted little attention to this issue, discussing it only in a handful of paragraphs in their opening and reply briefs. Consequently, we view it as a secondary argument and treat it accordingly in this opinion.

Because we agree with the Court of Federal Claims that Appellants do not possess any cognizable property interest within the meaning of the Takings Clause, we necessarily hold that the Government could not commit a <u>per</u> <u>se</u> taking without just compensation any more than it could commit a regulatory or any other kind of taking.

## III.    CONCLUSION

The order of the Court of Federal Claims granting the Government's motion to dismiss and the resulting judgment for the Government are

<u>AFFIRMED.</u>