Ronald ANDERSON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 00–212C.

United States Court of Federal Claims.

March 9, 2005.

A. Kathleen Tomlinson, Farrell Fritz, P.C., Uniondale, NY, for the plaintiffs.

Christian J. Moran, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, all of Washington, D.C., for the defendant. Y. Andrea Armstead, Federal Aviation Administration, Office of Chief Counsel, Washington, D.C., of Counsel.

### *OPINION AND ORDER*

WOLSKI, Judge.

Plaintiffs are employees of the Federal Aviation Administration ("FAA") who worked in its Air Traffic Service ("AT") and subsequently transferred to a new division, Operational Support Service ("AOS"). They have brought suit for breach of contract for benefits and salary lost as a result of their transfer. The case stands on the defendant's motion to dismiss for lack of jurisdiction.[1]

## I. BACKGROUND

Prior to July 1, 1994, each plaintiff was classified individually as either an FAA GS–2152 Air Traffic Control Specialist or an FAA FG–2152 Air Traffic Control Specialist ("AT 2152"). Am. Compl. ¶ 29. They worked in AT, a division of the FAA responsible for software development, maintenance and support. *Id.* ¶¶ 30–31. To form AOS, the FAA was required to merge AT with Airways Facilities ("AF"). *Id.* ¶¶ 25–26. Before the merger, AF had been responsible for the development, maintenance and support of computer hardware. *Id.* ¶ 30. The FAA designed AOS with the purpose of increasing agency efficiency and reducing staffing by combining computer hardware and software maintenance responsibilities into one organization. *See* McCaleb Decl. ¶¶ 4, 7. In order to achieve these objectives, the FAA needed a significant number of AT 2152s to transfer to AOS. *See* Am. Comp. ¶ 32. Faced with a budget shortfall, the FAA had to effect these transfers quickly, but could not do so due to the involuntary transfer procedures mandated by FAA personnel policies. McCaleb Decl. ¶¶ 7, 13. Thus, the only solution was for the FAA to convince AT 2152s voluntarily to transfer from AT to AF. *See* Am. Compl. ¶¶ 37–38.

The transition team knew that without significant incentives and assurances, AT 2152s would be unlikely to accept transfers from AT to AF. Riehle Decl. ¶ 6. This was because

---

1. Normally, on a motion to dismiss, the Court would treat all of the complaint's well-pled factual allegations to be true, and draw all reasonable inferences from them in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir.1998). Where, as here, the issue is jurisdiction, however, facts bearing on jurisdiction may be disputed, necessitating the consideration of facts outside of the pleadings and placing a burden of proof upon the plaintiff. *Englewood Terrace L.P. v. United States*, 61 Fed. Cl. 583, 584 (2004). *See Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 747–748 (Fed.Cir. 1988). But since the relevant questions for purposes of this motion are legal, not factual—whether the plaintiffs, as appointed federal employees, are prevented from maintaining a breach of employment contract action, and, if not, whether the government representatives alleged to have made the contractual offers had the legal authority to do so—the Court takes all well-pled factual assertions as true, and uses these as the basis for the background facts discussed below.

AT had earned a reputation within the FAA for providing the most favorable treatment of employees in terms of compensation and benefits. *Id.* To encourage transfer, FAA representatives made the following representations: "The transition will not adversely affect the grade, series, or career path of incumbent Air Traffic personnel." *Terminal Automation System Software Maintenance Transition Plan* (28 January 1994) ("1994 plan" or "1994 Transition Plan"), Def.'s App. at 8; Am. Compl. ¶ 32. "GS–2152's and all others will retain all rights of the former position. This includes, but is not limited to 5% differential, familiarization trips, grade retention, locality pay, etc." *Air Route Traffic Control Center (ARTCC) Software Maintenance Transition Report* (21 November 1994) ("1994 ARTCC agreement"), Def.'s App. at 23; *see also* Am. Compl. ¶¶ 34–36; *ARTCC Software Transition Memorandum of Understanding* ("MOU"), Def.'s App. at 18. "Any personnel in the 2152 classification series that transfer must retain benefits, career progression, and pay reform inclusion, identical to their previous position in the AT organization." *Air Traffic Services Operational Automation Responsibilities 1998 Transition Plan* ("1998 plan" or "1998 Transition Plan"), Def.'s App. at 79. "The grade, series or career path of Air Traffic personnel that elect to transfer to AOS will not be affected." *Id.* at 80. "2152 employees [selected for transfer from AT to AF] will retain all rights, benefits, career progression, and pay reform inclusion, associated with the 2152 series." *Id.* According to the plaintiffs, FAA administrators also gave oral assurances at meetings and briefings to recruit AT 2152s to transfer to AOS. Am. Compl. ¶¶ 39–40, 64. Finally, FAA management assured AT 2152s that in the future they could return to their previous status if they wished. Riehle Decl. ¶ 7.

In July, 1994, the first group of plaintiffs transferred to AOS. Am. Compl. ¶ 33. After December, 1994, the plaintiffs contend that the "FAA administrators continued to actively induce and recruit ATCS 2152 personnel . . . to transfer from their existing positions in the AT division to the AOS directorate" in

accordance with the MOU. *Id.* ¶ 37. In July, 1998, the FAA entered into a series of agreements with the National Air Traffic Controllers Association ("NATCA") regarding, among other things, compensation and benefits for NATCA members, including series 2152 air traffic controllers in the AT service.[2] *See id.* ¶¶ 39–40. The NATCA bargaining unit does not include series 2152 automation specialists ("2152s") in AOS. *Id.* ¶ 44. Had the plaintiffs remained in the AT service, they would have been included in the program. *See* McCaleb Decl. ¶ 24. Following the 1998 plan, additional plaintiffs moved to AOS, *see* Am. Compl. ¶ 43, but many 2152s who had already transferred to AOS considered returning to their previous AT status. *See id.* ¶ 50. FAA management, however, convinced them to stay in AOS by giving oral assurances that management would work out any compensation and benefits disparities between the 2152s and NATCA members. *Id.* ¶ 41. The plaintiffs stayed and waited for the compensation and benefits to be corrected. Instead of rectifying the disparities, the FAA offered to include the plaintiffs in the Core Compensation Plan ("CCP") pay system which went into effect in April, 2000. *See* McCaleb Decl. ¶ 24. The plaintiffs contend that inclusion in the CCP resulted not in comparable treatment with NATCA members but rather in a reduction in their salary and benefits.

The plaintiffs fall into three groups. In one group are those plaintiffs who transferred to AOS pursuant to and in reliance on the 1994 Transition Plan. Am. Compl. ¶ 48. In another group are those plaintiffs who transferred to AOS pursuant to the November 1994 ARTCC agreement in reliance on the December 1994 MOU. *Id.* ¶ 49. In the final group are those plaintiffs who transferred to AOS pursuant to and in reliance on the 1998 Transition Plan, as well as those plaintiffs already in AOS who decided not to transfer back to AT in reliance on the 1998 Transition Plan. *Id.* ¶ 50.

## II. PROCEDURAL POSTURE

The plaintiffs filed their original complaint on April 14, 2000, alleging breach of contract

---

2. FAA personnel referred to these agreements as "pay reform." Am. Compl. ¶ 44.

under the Tucker Act. 28 U.S.C. § 1491(a)(1) (2000). The defendant moved to dismiss, and the plaintiffs filed an amended complaint, withdrawing their claims of unjust enrichment and fraud in the inducement. Supplemental briefing was provided on the effect of the Federal Circuit's panel decision in *Schism v. United States,* 239 F.3d 1280 (Fed. Cir.2001). The plaintiffs' action was then stayed following the rehearing *en banc* by the Federal Circuit. 316 F.3d 1259 (Fed.Cir. 2002). After the *en banc* panel of the Federal Circuit issued its opinion and the Supreme Court denied a petition for certiorari, 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003), this Court lifted the stay. Both parties filed supplemental memoranda regarding the motion to dismiss. The case is before the Court on the defendant's motion to dismiss for lack of subject matter jurisdiction.

## III. DISCUSSION

The Court must first analyze the plaintiffs' employee status to determine whether they serve as appointees, contract employees or, as the plaintiffs argue, hybrid employees serving under appointment but with some aspects of the employment relationship governed by contract. If the plaintiffs are either contract employees or "hybrid employees," then the Court must analyze the "contract" to determine whether it is legally binding. To make this determination, the Court will examine the authority (or lack thereof) of the alleged agents of the government to bind the defendant.

### A. Are the Plaintiffs Appointed Employees?

Suits by appointed government employees for breach of employment contracts do not fall within the scope of section 1491(a)(1). "[U]nder the Tucker Act, 'if [a plaintiff's] employment was by "appointment," a breach of contract action against the government would be precluded.'" *Hamlet v. United States,* 63 F.3d 1097, 1101 (Fed.Cir. 1995) (quoting *Hamlet v. United States,* 873 F.2d 1414, 1417 n. 5 (Fed.Cir.1989) (citing *United States v. Hopkins,* 427 U.S. 123, 128, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976); *Army & Air Force Exchange Service v. Sheehan,*

456 U.S. 728, 738, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982))). If the plaintiffs are appointed employees, with no contractual aspects to their employment relationship, their case must be dismissed for lack of subject matter jurisdiction. "[A]bsent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government." *Hamlet,* 63 F.3d at 1101 (quoting *Chu v. United States,* 773 F.2d 1226, 1229 (Fed.Cir.1985)). Thus, a presumption exists that federal employees serve by appointment, not by contract. *Calvin v. United States,* 63 Fed.Cl. 468, 472 (2005). In their amended complaint, the plaintiffs state that they are FAA "employees." Am. Compl. ¶ 24. The plaintiffs do not dispute that they were originally hired by the FAA as "appointees." Tr. (Feb. 12, 2004) at 43–44. Therefore, absent some other provision of law, the plaintiffs, as appointees, have no cause of action in this Court.

### B. Are the Plaintiffs Appointed Employees with Contractual Aspects to Their Relationship?

The plaintiffs contend that at least some aspects of their employment are governed by contract, and they assert that they *can* simultaneously be party to both types of relationships. This proposition has been repeatedly rejected both by the Federal Circuit and the Court of Federal Claims. In *Collier v. United States,* 379 F.3d 1330 (Fed.Cir. 2004), the Federal Circuit stated unambiguously, "[a]s an appointed employee, [the plaintiff] did not have an employment contract with the government, and did not acquire such a contract through his job description or performance plan." *Id.* at 1332. Most recently, in *Adams v. United States,* 391 F.3d 1212 (Fed.Cir.2004), the Federal Circuit rejected the implied contract claim of federal employees:

Like all federal employees, Appellants served by appointment. The terms of their employment and compensation, consequently, were governed exclusively by statute, not contract. They had not, and could not have, entered into any separate agreement with the Government, express

or implied, for additional overtime compensation beyond that to which they were entitled by the applicable statute. *Id.* at 1221. *See also Calvin,* 63 Fed.Cl. at 473. The law is clear on this point: the plaintiffs cannot be both government employees and contractual employees; the two are mutually exclusive.

### C. Are the Plaintiffs Party to a Contractual Relationship with the Defendant?

■ Nevertheless, the plaintiffs argue that, when FAA management induced them to transfer to AOS, their employment relationship evolved into either a contractual relationship or an appointed relationship with non-comprehensive contractual aspects. Specifically, the plaintiffs argue that they were entitled to the same compensation and benefits, both current and future, as they held prior to their voluntary transfers. To support their argument, the plaintiffs cite state case law dealing with private at-will employment relationships. *See, e.g., Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983). The plaintiffs argue that cases such as *Pine River* stand for the proposition that an appointed employment relationship can change over time based upon subsequent actions taken by the parties. The plaintiffs urge the Court to extend this principle to the federal government employment context.[3] The Court must refuse to do so because it is not free to import state law to displace the Federal Circuit's binding and contrary precedent. Here, *Collier* and *Adams* are on point and determinative. In this case, the plaintiffs are all federal employees as defined by 5 U.S.C. § 2105, and their pay and benefits are set by statute, not by contract.

*Collier* and *Adams* are simply the most recent enunciation of this legal principle. In *Schism,* the Federal Circuit ruled that servicemen who have been promised free medical care for life, as appointed employees, do not have a contractual right to damages for

breach of that promise. 316 F.3d at 1300. In *Hauschild v. United States,* 53 Fed.Cl. 134 (2002), this Court ruled that a government official's promise of a promotion to the appointed employee-plaintiff was not legally enforceable. The Court held that promises of future promotion made by government officials do not transform an appointed position into a position with contractual aspects. *Id.* at 144–45. And in *Troutman v. United States,* 51 Fed.Cl. 527 (2002), this Court ruled that a government official's statement that induced a person to accept an appointment cannot create a contractual relationship with that person. The *Troutman* plaintiff claimed that he was entitled to a waiver for the federal annuity offset to his salary. The Court ruled that the promise to offset did not create a legally binding contract. *Id.* at 534–35.

While the plaintiffs attempt to extend state court cases dealing with private at-will employment contracts to the government employment context, the case law of this Court and the Federal Circuit makes clear that the plaintiffs, as appointed employees, did not and do not have contractual employment rights against the government.

### D. Did the Government Official(s) Who Made the Purported Offer(s) Have the Authority to Do So?

The defendant argues that even if a contractual relationship in whole or in part could have existed between the plaintiffs and the government, the government official or officials who made the offer lacked the authority to do so. The plaintiffs contend that the contractual aspects of their relationship with the defendant stem from verbal assurances and three documents: the 1994 plan, the MOU, and the 1998 plan. The plaintiffs argue that the recommendations, expectations and assumptions within each document constitute the contractual clauses in question. The plaintiffs argue correctly that documents

---

**3.** The plaintiffs consider *Army & Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982), distinguishable because the *Sheehan* plaintiff did not allege that the promise was made to induce the plaintiff to provide the government with valuable services. Pls.' Am. Suppl. Memo. Re. Mot. to

Dismiss Compl. at 3–4. That difference is irrelevant. Even assuming that the FAA "induced" the plaintiffs to provide valuable services, the decision is not actionable without a contract, and the existence of a contract depends upon the authority of the government representative and the employment status of the employee.

in the form of memoranda of agreement with the government can be enforceable contracts if they satisfy the requirements for a government contract, *i.e.*, offer, acceptance, consideration and a government representative with actual authority to bind the government. *Trauma Service Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997). In this case, however, the purported contracts lack the requirement of actual authority.

 The plaintiffs contend that two statutes give the FAA representatives the authority to enter into the alleged contracts. The plaintiffs argue that the Department of Transportation and Related Agencies Appropriations Act, Pub.L. 104–50, § 347(a), 109 Stat. 436, 460 (1995) ("DOT Act"), gives the FAA representatives this authority, because it authorized the FAA Administrator to implement a new personnel management system which would offer more flexibility in compensation. But the DOT Act does not expressly give the FAA Administrator the authority to negotiate individual contracts, and the authorization to create a personnel system distinct from the usual federal GS-system cannot fairly be interpreted to include the power to contract with individual, or even classes of, employees. The second act cited by the plaintiffs, the Federal Aviation Re-authorization Act of 1996, Pub.L. 104–264, 110 Stat. 3213 (codified in scattered sections of 49 U.S.C.) ("Re-authorization Act"), amended some of the statutes in title 49 of the United States Code.[4] The Re-authorization Act authorized the FAA Administrator:

> to appoint, transfer, and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the Administration. In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining ... nor shall the Administrator be bound by any require-

ment to establish such compensation or benefits at particular levels.

*Id.* § 225, 110 Stat. at 3232. Thus, Congress directed the FAA Administrator to devise and implement a new compensation plan for FAA employees who were not covered by a collective bargaining plan.[5] In so doing, Congress expressly declined to give the FAA Administrator authority to bargain with individual FAA employees. Lack of authority to bargain with individual employees implies a lack of authority to enter into a contract with individual employees. The FAA Administrator was not "bound by any requirement to establish such compensation or benefits at particular levels." *Id.* Hence, even assuming that the FAA Administrator had, at some point in time, the authority to bargain with the plaintiffs, the Re-authorization Act expressly removes any such authority.

 But did the FAA Administrator (or the Secretary of Transportation) ever possess the authority to bargain with the plaintiffs? The plaintiffs cite to 49 U.S.C. § 106(f) as a source of such authority. Section 106(f) provides that "the Secretary of Transportation ... controls the personnel and activities ... of the [Federal Aviation] Administration." The Secretary can delegate this authority to the FAA Administrator. *Id.* § 106(g)(1). The plaintiffs contend that this statute permits the FAA to negotiate and contract with FAA employees. The Court disagrees with the plaintiffs' interpretation. Rather than conferring such a broad power, section 106(f) is simply a general "housekeeping" statute, similar to 5 U.S.C. § 301, at issue in *Schism*.

> § 301 merely empowers an agency, in this case a military department, to regulate its day-to-day internal operations. But a housekeeping statute that authorizes rules of agency organization, procedure or practice and not substantive rules cannot confer a right to, or otherwise authorize the promise of a right or entitlement to, free lifetime medical care.

---

4. The Re-authorization Act became effective 30 days after enactment. *Id.* § 203, 110 Stat. 3213, 3227. Because it was enacted on October 9, 1996, it became effective on November 8, 1996, two years *after* the 1994 plan and the MOU were written.

5. The Act specifically exempted employees represented by NATCA. *See* Pub.L. 104–264, § 225, 110 Stat. 3213, 3232 (1996); 49 U.S.C. § 40122(a)(1).

*Schism,* 316 F.3d at 1281. The power to control "personnel and activities" does not entail the power to control personnel compensation on a per-employee basis. At oral argument, plaintiffs' counsel noted that nothing in section 106(f) expressly precludes the FAA Administrator from having that authority. Tr. (Feb. 12, 2004) at 49. To be sure, counsel is correct. But she has not offered, nor has the Court found, any authority interpreting section 106(f) to give the FAA Administrator that authority. In the absence of such precedent, the plaintiffs' construction of the text is more than the statute can bear, given the Federal Circuit's decision in *Schism.*

Other sections of Title 5 further support the Court's conclusion that the FAA never had the authority to contract with employees. Prior to 1996, the plaintiffs were General Schedule employees as defined by 5 U.S.C. § 2105. The Office of Personnel Management ("OPM") was responsible for making final determinations of position classifications. *See* 5 U.S.C. § 5103. Compensation for each classification was set by statute. *See* 5 U.S.C. §§ 5101–5115; §§ 5301–5392. Hence, OPM—not the Secretary of Transportation and not the FAA Administrator— was responsible for setting the plaintiffs' compensation prior to the DOT Act. Neither the FAA Administrator nor his subordinates have the authority under section 106(f) to enter into contracts regarding employment compensation or benefits.

One document cited by the plaintiffs postdates the 1996 appropriation: the 1998 plan. Def.'s App. at 72–75. But the assumptions within the 1998 plan do not give rise to an offer to the plaintiffs, who are not NATCA members. The various verbal assurances given by senior FAA officials to the plaintiffs regarding the 1998 plan similarly fail to help the plaintiffs' case, because, as discussed above, the FAA representatives did not have

the authority to bind the government.[6] "Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not *ipso facto* create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government."[7] *Schism,* 316 F.3d at 1275 (quoting *Shaw v. United States,* 226 Ct.Cl. 240, 640 F.2d 1254, 1260 (1981)).

## IV. CONCLUSION

The plaintiffs are appointed government employees with no contractual rights; and without a contract, the Court has no jurisdiction over the amended complaint. Even if appointed government employees could acquire contractual rights against the government, the Court would still lack jurisdiction here because the government officials who allegedly made the contracts did not have the legal authority to do so. Accordingly, because the plaintiffs have failed to overcome the presumption of appointment and have failed to provide a basis in contract for their claims, the defendant's motion to dismiss for lack of subject matter jurisdiction is **GRANTED.** The Clerk is directed to close the case.

**IT IS SO ORDERED.**

---

6. The plaintiffs also argue that the post–1998 plan assurances created a contract, the consideration being plaintiffs' forfeiture of their right to return to AT. Pls.' Am. Suppl. Memo. Re. Mot. to Dismiss Compl. at 6–7. The Court disagrees. Any such contract would be illusory, for the plaintiffs' consideration—their right to return— would had to have been established before 1996, but FAA contractual authority did not exist at

that time. Without such authority, the plaintiffs could not have acquired the return rights they allegedly bargained away.

7. The plaintiffs indicate that the quoted material from *Shaw* is dicta. True, but *Schism* used the *Shaw* quotation as its holding, thus binding this Court.