AFT MICHIGAN v STATE OF MICHIGAN (ON REMAND)

Docket Nos. 303702, 303704, and 303706. Submitted July 23, 2015, at
    Lansing. Decided June 7, 2016, at 9:10 a.m. Leave to appeal
    granted ___ Mich ___.

    In Docket No. 303702, AFT Michigan and numerous other labor
    organizations representing public school employees brought an
    action in the Court of Claims against the state of Michigan,
    asserting various constitutional challenges to MCL 38.1343e, as
    enacted by 2010 PA 75, as well as seeking to enjoin further
    withholding by the employers of 3% of the employees' wages and
    the remittance of that amount to the Michigan Public School
    Employees' Retirement System (MPSERS) as "employer contri-
    butions" to the trust that funds retiree healthcare benefits. In
    Docket No. 303704, Timothy L. Johnson and three other public
    school employees brought a similar action in the Court of Claims
    against MPSERS and others, seeking similar relief. In Docket No.
    303706, Deborah McMillan and four other public school employ-
    ees likewise brought a similar action in the Court of Claims
    against MPSERS and others, seeking similar relief. The court,
    Clinton Canady, III, J., ordered in all three cases that the
    withheld wages be placed in an interest-bearing account rather
    than in the MPSERS trust and ordered that the wages be
    maintained in that account until the legal challenge was resolved.
    The court then granted summary disposition in favor of the
    organizational plaintiffs in the first action and partial summary
    disposition in favor of plaintiffs and partial summary disposition
    in favor of defendants in both the second and third actions. The
    court held that the labor organizations had standing to challenge
    the statute, that the claims were ripe for review, and that the
    statute violated plaintiffs' rights under both the Takings Clauses
    and the Due Process Clauses of the federal and state Constitu-
    tions but did not violate the constitutional provisions barring the
    impairment of contracts by the state. The court also dismissed
    plaintiffs' common-law breach-of-contract claim. The state of
    Michigan appealed with regard to the first action (Docket No.
    303702). MPSERS and some of the other defendants in the other
    two actions also appealed, and the plaintiffs in those actions
    cross-appealed (Docket Nos. 303704 and 303706). The Court of

Appeals, SHAPIRO, P.J., and BECKERING, J. (SAAD, J., concurring in part and dissenting in part), consolidated the appeals and held that the labor organizations had standing, that the claims were ripe for review, and that the statute was unconstitutional because it (1) impaired employment contracts between public school employees and employer school districts in violation of the Contracts Clauses of the state and federal Constitutions, Const 1963, art 1, § 10 and US Const, art I, § 10; (2) effected a taking without just compensation in violation of the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Ams V and XIV; and (3) violated the guarantees of substantive due process in the state and federal Constitutions, Const 1963, art 1, § 17 and US Const, Am XIV, § 1. 297 Mich App 597 (2012) (*AFT Mich I*), vacated 498 Mich 851 (2015). Following the Court of Appeals' decision, the Legislature enacted 2012 PA 300, which amended MCL 38.1343e to add provisions that substantially altered the scope and effect of MCL 38.1343e; most notably, MCL 38.1343e, as amended by 2012 PA 300, permitted employees to opt out of the retiree healthcare system, which made employee contributions voluntary instead of mandatory, and it also provided a refund mechanism that allowed employees who paid in, but who did not ultimately qualify for benefits, to receive a refund on their contributions. AFT Michigan and other labor organizations then brought a separate action in the Court of Claims against the state of Michigan and others, similarly challenging the constitutionality of 2012 PA 300, and the court, Rosemarie E. Aquilina, J., upheld 2012 PA 300 against the constitutional challenges. The Court of Appeals, SAAD, P.J., and K. F. KELLY, J. (GLEICHER, J., concurring), affirmed, reasoning that the voluntary nature of the contributions and the refund mechanism in MCL 38.1343e, as amended by 2012 PA 300, served to remedy the constitutional defects that the Court of Appeals had identified in its 2012 decision pertaining to 2010 PA 75. *AFT Mich v Michigan*, 303 Mich App 651 (2014). The Supreme Court affirmed. *AFT Mich v Michigan*, 497 Mich 197 (2015) (*AFT Mich II*). Shortly thereafter, the Supreme Court vacated the Court of Appeals' 2012 decision in these cases and remanded them to the Court of Appeals for reconsideration in light of the enactment of 2012 PA 300 and the Supreme Court's decision in *AFT Mich II*. 498 Mich 851 (2015). The Supreme Court directed the Court of Appeals to consider which issues presented in these cases had been superseded by the enactment of 2012 PA 300 and the Supreme Court's decision in *AFT Mich II* and further directed the Court of Appeals to only address any outstanding issues that the

parties raised regarding 2010 PA 75 that were not superseded or otherwise rendered moot by that enactment and decision.

On remand, the Court of Appeals *held*:

1. An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy. Because the employees' withheld wages maintained in escrow will be dispersed to either the state or to the employees pending a final determination of this case, the Court's determination of the constitutional questions presented would have a practical legal effect, and the issues raised were not moot.

2. Nothing will be read into a clear statute that is not within the manifest intention of the Legislature as derived from the language of the statute itself. Because the language of 2012 PA 300 neither contains a retroactivity provision nor makes any reference to the funds collected during the mandatory period (during the period that 2010 PA 75—but not 2012 PA 300—was in effect), the 2012 amendments could not be read as retroactive nor as governing the funds collected before the effective date of 2012 PA 300. The change from mandatory to voluntary contributions set forth in 2012 PA 300 did not retroactively render the reduction of wages during the mandatory period constitutional. The fundamental constitutional defect imposed by 2010 PA 75 during the mandatory period was not that mandatory contributions in and of themselves were unconstitutional, but rather that the mandated employee contributions were to a system in which the employee contributors had no vested rights. The conclusion in *AFT Mich I* that mandatory confiscation of employee wages as employer contributions to a system in which a right to benefits could never vest violated several constitutional guarantees was based on the Supreme Court's decision in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642 (2005), that retirement healthcare benefits did not constitute accrued financial benefits and so were not protected from reduction or elimination by Article 9, § 24 of the 1963 Constitution. Because the retirement healthcare benefits at issue in this case were not accrued financial benefits, the Legislature had the authority to reduce or eliminate those benefits at any time; therefore, the wages withheld during the mandatory period were taken without any legally enforceable guarantee that the contributors would receive the retirement health benefits provided to present retirees. Accordingly, the Supreme Court's decision in *AFT Mich II* did not provide a basis to alter the analysis in *AFT Mich I* concerning the constitution-

ality of the involuntary wage reductions during the mandatory period, and MCL 38.1343e, as enacted by 2010 PA 75, was unconstitutional as applied from its effective date through the effective date of the voluntary system created by 2012 PA 300.

3. The Contracts Clauses of the state and federal Constitutions, Const 1963, art 1, § 10 and US Const, art I, § 10, cl 1, prohibit laws that impair obligations under contracts. In deciding whether an impairment of contract violates the Contracts Clause, a court must determine whether the particular impairment is necessary to the public good; in other words, it must be shown that the state did not (1) consider impairing the contracts on par with other policy alternatives, (2) impose a drastic impairment when an evident and more moderate course would serve its purpose equally well, or (3) act unreasonably in light of the surrounding circumstances. Heightened scrutiny applies when a governmental entity is party to the contract and benefits from the impairment. During the mandatory period, MCL 38.1343e, as enacted by 2010 PA 75, operated as a substantial impairment of the employment contracts between plaintiffs and the employing educational entities because plaintiffs agreed to provide their labor and expertise to the school districts for wages bargained for and set forth in contract, and the act required that the employers not pay the contracted-for wages but instead pay 3% less than the contracts provided. While courts have found statutes impairing contractual obligations to be reasonable and necessary when the impairment is the consequence of remedial legislation intended to correct systematic imbalances in the marketplace, this case did not involve corrections to the marketplace to assure free competition. Additionally, while modest, temporary impairments of government contracts may be imposed as a matter of last resort to address a fiscal emergency, such circumstances must be extraordinary and consideration must be given to the degree of the impairment in amount and in time; in this case, MCL 38.1343e, as enacted by 2010 PA 75, was not designed as a temporary measure, and defendants presented no evidence to the trial court that other means of undertaking long-term restructuring of retiree health benefit funding had been attempted before the adoption of 2010 PA 75. Accordingly, MCL 38.1343e, as enacted by 2010 PA 75, worked a severe, permanent, and immediate change in contractual relationships and violated the Contracts Clauses of the state and federal Constitutions from its effective date until the effective date of 2012 PA 300.

4. Under the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Am V, the

government may not take private property for public use without providing just compensation to the owner. When the government does not merely impose an assessment or require payment of an amount of money without consideration but instead asserts ownership of a specific and identifiable "parcel" of money, such an action constitutes a "per se" violation of the Takings Clause. In this case, plaintiffs' salaries were specific and identifiable funds in which they unquestionably held a property interest, and the state took possession of 3% of plaintiffs' wages before allowing plaintiffs to take possession of their property. While *Adams v United States*, 391 F3d 1212, 1223 (CA Fed, 2004), held that an action to enforce payment of a statutory obligation for payment—unlike a contract for payment—does not establish a vested property right and thus does not implicate the Takings Clause, plaintiffs in this case had a contract-based property right in their own wages that implicated the Takings Clause. Accordingly, 2010 PA 75 violated the Takings Clauses of the state and federal Constitutions from its effective date until the effective date of 2012 PA 300.

5. The Due Process Clauses of the state and federal Constitutions, Const 1963, art 1, § 17 and US Const, Am XIV, § 1, forbid the state from depriving any person of life, liberty, or property without due process of law. In this case, payment of healthcare benefits owed by the government to a particular set of its retired employees was not analogous to the maintenance of a statewide workers' compensation risk-sharing system to assure market and economic stability for the private sector. The mechanism defined in MCL 38.1343e, as enacted by 2010 PA 75, was neither one involving general taxation for a general fund with specific uses of the monies later determined by the Legislature nor one imposing a fee for service to the payee, and the mechanism was not one that required individuals to fund benefits that they themselves had a vested right to receive. Defendants posited no evidence or even argument to suggest that the funding of the retirement benefits could not have been satisfied by measures that did not raise due-process concerns. Accordingly, 2010 PA 75 was unreasonable, arbitrary, and capricious and violated the Due Process Clauses of the state and federal Constitutions from its effective date until the effective date of 2012 PA 300.

Trial court orders granting summary disposition or partial summary disposition in favor of plaintiffs in each of the cases affirmed; case remanded to the trial court with the direction to return the subject funds, with interest, to the relevant employees.

SAAD, J., concurring in part and dissenting in part, concurred with the majority's conclusion that none of the issues before the Court of Appeals had been rendered moot by the Supreme Court's decision in *AFT Mich II*, but dissented from the majority's view that the mandatory contributions in MCL 38.1343e, as enacted by 2010 PA 75, violated the Contracts Clauses of the Michigan and United States Constitutions, US Const, art I, § 10 and Const 1963, art 1, § 10, the Takings Clauses of the Fifth Amendment and Const 1963, art 10, § 2, and the Due Process Clauses of the Fourteenth Amendment and Const 1963, art 1, § 17. Judge SAAD would have held that MCL 38.1343e did not violate the Contracts Clauses because, as a matter of law, MCL 38.1343e did not operate as a substantial impairment of a contractual relationship given that MCL 38.1343e neither altered a contract between the state itself and the public school employees nor altered the public school employees' contracts with some third party. The Supreme Court has ruled that the Legislature created and may revoke retiree healthcare benefits and that such benefits are neither a constitutionally protected contract right nor a vested right under the state Constitution. Under this ruling, plaintiffs had no contract with the state for retiree healthcare benefits and had no vested rights in retiree healthcare benefits; therefore, no contract had ever been impaired because no contract had ever existed, and plaintiffs' constitutional challenges under the Contracts Clauses should have failed. Additionally, the collective bargaining agreements between the public school employees and various school districts were not even touched, much less impaired, and did not address the retiree healthcare system, which is a benefit created by the state. The wage levels negotiated in collective bargaining agreements were not affected by the requirement under MCL 38.1343e that public school employees contribute money to the healthcare fund because the employers' obligation to pay the employees their contracted-for salaries was not altered. The fact that the state chose a paycheck deduction method as the particular mechanism to ensure that employees made the contribution did not convert a permissible legislatively mandated contribution into an unconstitutional impairment of contract. Judge SAAD also would have held that MCL 38.1343e did not effectuate a taking of private property for which the government must give just compensation. No caselaw holds that a taking occurs when the Legislature requires a public school employee to contribute money as a condition for receiving benefits in a state-created retirement healthcare program that was designed for the benefit of the employee. The majority's application of the

Takings Clauses to plaintiffs' claims was legally unsupportable because no constitutionally protected property interest was invaded by requiring a monetary contribution to a retiree healthcare plan. Additionally, any property interests in the wage levels contained in plaintiffs' respective collective bargaining agreements were not retroactively affected, and no extraction of interest generated in a specific fund of money occurred. Therefore, plaintiffs' constitutional challenges under the Takings Clauses should have failed. Finally, Judge SAAD would have reversed the trial court's grant of summary disposition to plaintiffs on the substantive due-process claims because plaintiffs were precluded from asserting generalized due-process claims when the Takings and Contracts Clauses provided explicit textual sources of constitutional protection regarding the type of governmental conduct at issue. Furthermore, plaintiffs' due-process claims were without merit. The Supreme Court articulated a rational basis for MCL 38.1343e when it upheld the constitutionality of 2012 PA 300 and concluded that the state had an unquestionably legitimate interest in implementing a fiscally responsible system by which to fund public school employees' healthcare. The fact that there may have been better or less intrusive ways to accomplish this funding did not transform MCL 38.1343e into an unconstitutional deprivation of substantive due process. Judge SAAD would have upheld MCL 38.1343e, as enacted by 2010 PA 75, as constitutional.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal Counsel, and *Patrick M. Fitzgerald*, Assistant Attorney General, for the state defendants.

*Mark H. Cousens* for AFT Michigan and others.

*Miller Cohen, PLC* (by *Bruce Miller, Keith D. Flynn*, and *Robert D. Fetter*), for Timothy Johnson, Janet Heslet, Ricky A. Mack, and Denise Zieja.

*White, Schneider, Young & Chiodini, PC* (by *James A. White, Kathleen C. Boyle*, and *Timothy J. Dlugos*), and *Michael M. Shoudy* for Deborah McMillan, Thomas Brenner, Theresa Dudley, Katherine Daniels, and Corey Cramb.

ON REMAND

Before: SHAPIRO, P.J., and SAAD and BECKERING, JJ.

SHAPIRO, P.J. On May 19, 2010, the Legislature enacted 2010 PA 75, significantly revising the Public School Employees Retirement Act (PERA), MCL 38.1301 *et seq*. In particular, Section 43e of 2010 PA 75 required all current public school employees to contribute 3% of their salaries to the Michigan Public School Employees' Retirement System (MPSERS).[1] These contributions, which were classified as "employer contributions" to a nonvesting retiree health benefit program, constituted a mandatory deduction from the employees' contracted-for compensation with their respective employers. 2010 PA 75, § 43e. Plaintiffs brought suit, challenging the constitutionality of 2010 PA 75. The trial court held that the statute violated plaintiffs' rights under both the Takings Clauses and the Due Process Clauses of the federal and state Constitutions, but held that it did not violate the constitutional provisions barring the impairment of contracts by the state.

The parties appealed in this Court. In *AFT Mich v Michigan*, 297 Mich App 597, 616, 621, 627; 825 NW2d 595 (2012) (*AFT Mich I*), vacated *AFT Mich v Michigan*, 498 Mich 851 (2015), we held that that 2010 PA 75 was unconstitutional because it (1) impaired employment contracts between public school employees and employer school districts in violation of the Contracts Clauses of the state and federal Constitutions, Const 1963, art 1, § 10 and US Const, art I, § 10; (2) effected

---

[1] The statute required any public school employee whose salary was less than $18,000 to contribute 1.5% for the fiscal year starting July 1, 2010. 2010 PA 75, § 43e. Beginning July 1, 2011, all employees were required to contribute the full 3%. *Id.*

a taking without just compensation in violation of the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Ams V and XIV; and (3) violated the guarantees of substantive due process in the state and federal Constitutions, Const 1963, art 1, § 17 and US Const, Am XIV, § 1. On September 27, 2012, defendants sought leave to appeal in the Michigan Supreme Court, which took no action on the application for nearly two years. During that time, and in response to this Court's decision in *AFT Mich I*, the Legislature enacted 2012 PA 300, which further modified PERA. See *AFT Mich v Michigan*, 497 Mich 197, 205; 866 NW2d 782 (2015) (*AFT Mich II*). The 2012 act did not repeal MCL 38.1343e, but it added provisions substantially altering that section's scope and effect. First, it permitted employees hired before September 4, 2012, to opt out of the retiree healthcare system as of the first day of the pay period that would begin on or after February 1, 2013. MCL 38.1391a(5). Employees that opted out would, as of that date, no longer be subject to the challenged mandatory 3% reduction and would not receive any health insurance coverage premium from the retirement system. MCL 38.1391a(1) and (5). Second, the 2012 act significantly reduced benefits to those who elected to remain in the retiree healthcare system. See MCL 38.1391. Third, it provided for a separate retirement allowance for public school employees hired before September 4, 2012, who elected to pay contributions and remain in the system, but later failed to qualify for retiree healthcare benefits. MCL 38.1391a(8). In other words, it provided a refund mechanism that allowed employees who paid in, but did not ultimately qualify for benefits, to receive a refund on their contributions. Finally, the 2012 act eliminated retirement health benefits under the retire-

ment system for all new employees hired after September 4, 2012. MCL 38.1391a(1).

This Court upheld 2012 PA 300 against a constitutional challenge, reasoning that the voluntary nature of the contributions and the refund mechanism served to remedy the constitutional defects identified in *AFT Mich I. AFT Mich v Michigan*, 303 Mich App 651, 673, 676, 676-679; 846 NW2d 583 (2014). The Supreme Court affirmed. *AFT Mich II*, 497 Mich at 249-250.

Shortly after its affirmance in *AFT Mich II*, the Supreme Court vacated our opinion in *AFT Mich I* and remanded it to this Court

> for reconsideration in light of the enactment of 2012 PA 300 and this Court's decision in [*AFT Mich II*]. On remand, the Court of Appeals shall consider what issues presented in these cases have been superseded by the enactment of 2012 PA 300 and this Court's decision upholding that Act, and it shall only address any outstanding issues the parties may raise regarding 2010 PA 75 that were not superseded or otherwise rendered moot by that enactment and decision. [*AFT Mich*, 498 Mich 851 (2015).]

Per the Supreme Court's direction, we have considered whether the adoption of 2012 PA 300 or the Supreme Court's decision in *AFT II* renders moot any of the challenges to 2010 PA 75 or supersedes any of the constitutional analysis we employed in our earlier review of that act. We conclude that neither the legislative amendments nor the Supreme Court's decision supersedes or renders moot any of the issues raised in *AFT Mich I* as to the mandatory wage reductions made during the period 2010 PA 75—but not 2012 PA 300— was in effect (hereinafter "the mandatory wage reduction period" or "the mandatory period"). We also conclude that neither the passage of 2012 PA 300 nor the Supreme Court's decision in *AFT Mich II* requires that

we alter the analysis we employed in our now-vacated decision in *AFT Mich I* as to the constitutionality of 2010 PA 75 as it existed during the mandatory wage reduction period. The compulsory collection of 3% of employee wages during that period was unconstitutional. Accordingly, we remand this matter to the trial court with the direction to return the subject funds, with interest, to the relevant employees.

### I. MOOTNESS

The enactment of 2012 PA 300 and our Supreme Court's decision in *AFT Mich II* upholding that act do not render moot the issues raised in the present cases.

> This Court generally does not address moot questions or declare legal principles that have no practical effect in a case. An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy. [*In re Pollack Trust*, 309 Mich App 125, 154; 867 NW2d 884 (2015) (quotation marks and citations omitted).]

It is undisputed that during the mandatory period, 3% of public school employees' contracted-for wages were withheld by their employers. Those wages, totaling more than $550 million, are being held in escrow pending a final determination in this case. The parties agree that if 2010 PA 75, as it applied during the mandatory period, is found to be constitutional, then the funds held in escrow will be provided to the state, but that if it is found to be unconstitutional, then the escrowed funds will be returned to the employees who earned them. Because determination of the constitutional questions before us will have a practical legal effect on the disposition of the escrowed funds, the issues raised in these cases are not moot.

We must also determine whether the enactment of 2012 PA 300 and the decision in *AFT II* require that we alter the analysis in our now-vacated opinion regarding the constitutionality of 2010 PA 75 as applied during the mandatory period. In our earlier opinion, we concluded that mandated confiscation of employee wages as employer contributions to a system in which a right to benefits could never vest[2] violated several constitutional guarantees. With the enactment of 2012 PA 300, however, all future contributions became voluntary, not mandatory. Unlike the sums withheld during the mandatory period, all the monies paid from employee wages into the retirement health system were thereafter paid voluntarily; no employee was or could be legally compelled to financially invest in a system in which the intended fruits were not "accrued financial benefits." See *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 658-659; 698 NW2d 350 (2005). The question before us now is whether the change from mandatory to voluntary contributions set forth in 2012 PA 300 retroactively rendered constitutional the reduction of wages during the mandatory period.

As with any question of statutory interpretation and application, we begin with the language of the statute. *Lash v Traverse City*, 479 Mich 180, 187; 735 NW2d 628

---

[2] Our conclusion was driven by the decision of the Supreme Court in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 649, 658-659; 698 NW2d 350 (2005), that retirement healthcare benefits did not constitute "accrued financial benefits" and so were not protected from reduction or elimination by Article 9, § 24 of the 1963 Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." See also MCL 38.2733(6) ("This act shall not be construed to define or otherwise assure, deny, diminish, increase, or grant any right or privilege to retirement health care benefits . . . to any person . . . .").

(2007). The language of 2012 PA 300, as the state concedes, contains no retroactivity provision and makes no reference to the funds collected during the mandatory period. "Nothing will be read into a clear statute that is not within the manifest intention of the Legislature as derived from the language of the statute itself." *Thomason v Contour Fabricators, Inc*, 255 Mich App 121, 124-125; 662 NW2d 51 (2003). Accordingly, we may not read the 2012 amendments as retroactive nor as governing funds collected before the application of 2012 PA 300.

The state correctly points out that if the escrowed funds are turned over to the state, the funds would be subject to the refund mechanism of 2012 PA 300 for those employees who ultimately do not qualify for retirement healthcare benefits. Specifically, MCL 38.1391a(8) provides that the refunded sum shall be "equal to the contributions made by the member under section 43e"; therefore, it must include the sums collected under Section 43e from its inception, not merely after the modifications of 2012 PA 300. Therefore, it can be argued that so long as MCL 38.1391a(8) remains unaltered and in effect, those employees who do not opt out of the new system but do not ultimately qualify for benefits will not suffer a constitutional deprivation because they will receive back what they put in, including the sums withheld during the mandatory period. Putting aside the fact that the number of employees who will qualify for the refund is likely relatively few, this provision completely fails to address the fundamental constitutional defect imposed by 2010 PA 75 during the mandatory period. The problem was not that mandatory contributions are in and of themselves unconstitutional. The constitutional problem was, and is, that the mandated employee contributions were to a system *in which the employee contributors have no vested*

*rights*. Because retirement healthcare benefits are not "accrued financial benefits," the Legislature has the authority to reduce or eliminate those benefits— including the refund mechanism of MCL 38.1391a(8)—at any time. While there is no constitutional prohibition against inviting employees to voluntarily participate in an unvested system, the same is not true when participation is mandated by law. The wages withheld during the mandatory period were taken without any legally enforceable guarantee that the contributors would receive the retirement health benefits provided to present retirees. That has not changed. The sums withheld during the mandatory period were taken involuntarily, and the state still retains the right to reduce or eliminate retiree health benefits for those who were compelled to surrender their wages.[3]

*AFT Mich II* does not provide a basis to alter our analysis of the constitutionality of the involuntary wage reductions during the mandatory period.[4] Accordingly, we conclude that 2010 PA 75 was unconstitutional as it applied from its effective date through the transition date to the voluntary system created by 2012 PA 300.

## II. CONTRACTS CLAUSE

During the mandatory period, Section 43e of 2010 PA 75 operated as a substantial impairment of the employment contracts between plaintiffs and the em-

---

[3] Indeed, 2012 PA 300 does not even contain a provision to refund the involuntarily withheld sums to those employees who chose not to participate in the retirement health system after the enactment of 2012 PA 300.

[4] In addition, in their supplemental briefs on remand, the parties have not referred us to any recent caselaw that would suggest we should alter our analysis.

ploying educational entities. The employment con-
tracts provided for a particular amount of wages, and
2010 PA 75 required that the employers not pay the
contracted-for wages, but instead pay 3% less than the
contracts provided.[5] We note that this is not a broad
economic or social regulation that impinges on certain
contractual obligations by happenstance or as a collat-
eral matter. Rather, the statute directly and purpose-
fully required that certain employers not pay
contracted-for wages. Such an action is unquestionably
an impairment of contract by the state. "In the employ-
ment context, there likely is no right both more central
to the contract's inducement and on the existence of
which the parties more especially rely, than the right to
compensation at the contractually specified level." *Bal-
timore Teachers Union, American Federation of Teach-
ers Local 340, AFL-CIO v Baltimore Mayor & City
Council*, 6 F3d 1012, 1018 (CA 4, 1993). See also
*Buffalo Teachers Federation v Tobe*, 464 F3d 362, 368
(CA 2, 2006) ("Contract provisions that set forth the
levels at which union employees are to be compensated
are the most important elements of a labor contract.
The promise to pay a sum certain constitutes not only
the primary inducement for employees to enter into a

---

[5] Defendants argue that there is no unconstitutional impairment of
contract because (1) plaintiffs do not have a contract that is affected by
2010 PA 75 and (2) plaintiffs do not have a contractual right to be free
from mandatory deductions for retiree healthcare or to continue in a
particular retiree healthcare plan. These arguments are wholly without
merit. Plaintiff-employees' employment contracts, which set forth speci-
fied wages, were unquestionably impaired by the mandatory and
involuntary requirement in 2010 PA 75 that 3% of their wages be
withheld and transformed into employer contributions to a retiree
healthcare system without vested benefits. Moreover, plaintiffs have
never claimed that they have a right to be free of mandatory deductions
in general; they have only claimed a right to be free from unconstitu-
tional mandatory deductions.

labor contract, but also the central provision upon which it can be said they reasonably rely.").

In *Baltimore Teachers*, the Fourth Circuit held that a temporary furlough plan under which employees lost just under 1% of their annual salary for one year constituted a substantial impairment of contract.[6] The present case involves a reduction three times as great and not merely for a single year. Plaintiffs have agreed to provide their labor and expertise to the school districts for wages bargained for and set forth in contract. For the state to mandate a 3% reduction in the contractually agreed-upon price of their labor is unquestionably an impairment of contract by the state.

That does not, however, resolve the constitutional question. In order to determine whether that impairment violates the Contracts Clause, we must determine whether the state has shown that it did not: "(1) 'consider impairing the . . . contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances[.]' " *Buffalo Teachers*, 464 F3d at 371, quoting *US Trust Co of New York v New Jersey*, 431 US 1, 30-31; 97 S Ct 1505; 52 L Ed 2d 92 (1977). Put more generally, we are to determine whether the particular impairment is "*necessary* to the public good . . . ." *In re Certified Question*, 447 Mich 765, 777; 527 NW2d 468 (1994) (emphasis added).

---

[6] The *Baltimore Teachers* court noted that "because individuals plan their lives based upon their salaries, we would be reluctant to hold that any decrease in an annual salary beyond one that could fairly be termed *de minimis* could be considered insubstantial." *Baltimore Teachers*, 6 F3d at 1018 n 8.

In addressing these issues, we must consider that the employers in question are themselves governmental entities and that these entities benefited as a result of the challenged legislation given that they used the monies collected as "employer contributions" that they would have otherwise had to pay to the retiree health-care benefits fund.[7] Because a governmental entity is party to the contract and benefits from the impairment, we are to employ heightened scrutiny in our review of the statute. *Buffalo Teachers*, 464 F3d at 370-371.

As a general rule, courts have found statutes impairing contractual obligations to be reasonable and necessary when the impairment is the consequence of remedial legislation intended to correct systemic imbalances in the marketplace. Such legislation may have positive or negative effects on particular economic actors and may in some cases result in altered contractual obligations without offending the Contracts Clause. For example, we rejected a Contracts Clause challenge in *Health Care Ass'n Workers Compensation Fund v Bureau of Worker's Compensation Dir*, 265 Mich App 236, 242; 694 NW2d 761 (2005), which involved a statute designed to unclog the marketplace for workers' compensation insurance by eliminating unduly anticompetitive contractual provisions that punished employers for changing insurers. Similarly, the United States Supreme Court held that correcting an imbalance between gas prices on the interstate and intrastate markets was a significant and legitimate state interest. *Energy Reserves Group, Inc v Kansas Power & Light Co*, 459 US 400, 417; 103 S Ct 697; 74 L Ed 2d 569 (1983). The present case, however, does not involve corrections to the marketplace to assure free competition.

---

[7] According to the record, the 3% wage reduction will cover nearly 40% of the overall *employer* contributions for retiree healthcare benefits.

We recognize that there are cases holding that a modest, temporary impairment of government contracts may be imposed as a matter of last resort to address a fiscal emergency. However, as the cases relied on by defendants show, such circumstances must be extraordinary, and the degree of the impairment in amount and in time is central to the question of whether the impairment passes constitutional muster. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Allied Structural Steel Co v Spannaus*, 438 US 234, 245; 98 S Ct 2716; 57 L Ed 2d 727 (1978). As in *Allied Structural*, the statute at issue in this case "worked a severe, permanent, and immediate change in [contractual] relationships." *Id*. at 250.

In *Baltimore Teachers*, 6 F3d at 1014, the city of Baltimore responded to sudden budget shortfalls caused by reductions in state aid of over $37 million during the last three months of 1991 by imposing involuntary furloughs for city employees. These furloughs were not conceived of as a long-term funding mechanism, but instead as a temporary response to a fiscal emergency. *Id*. at 1021. The furlough days resulted in Baltimore reducing annual salaries by less than 1% and only for a single year. Moreover, while the furloughs were involuntary, employees were provided with reduced hours that were equivalent to the reduction in their wages. The Fourth Circuit held that while the actions constituted an impairment of contract, they did not violate the Contracts Clause because the wage reduction was temporary, the amount of the resulting reduction in wages was no greater than necessary to meet the immediate budgetary shortfall, and the city had first taken other actions, including a significant cut in city services and laying off employees. *Id*. at 1020. In contrast, Section 43e of 2010 PA 75 reduced

public school employees' wages by an amount more than three times that which concerned the court in *Baltimore Teachers* and did not provide time off in exchange. Further, Section 43e was not designed as a temporary measure, and defendants presented no evidence to the trial court that other means of undertaking long-term restructuring of retiree health benefit funding had been attempted or even reviewed before 2010 PA 75 was adopted.[8]

In *Univ of Hawaii Prof Assembly v Cayetano*, 183 F3d 1096, 1102-1104 (CA 9, 1999), the United States Court of Appeals for the Ninth Circuit concluded that the state's action in delaying paydays by a few days, even without a reduction in the actual amount of pay, constituted a substantial impairment of contract because the timing of payment was part of the collective bargaining agreement. As in *Baltimore Teachers* and *Buffalo Teachers*, the *Univ of Hawaii* court noted the higher level of scrutiny applicable to legislative interference with governmental, as opposed to private, contracts and struck down the payday delays, noting that " 'although perhaps politically more difficult, numerous other alternatives exist which would more effectively and equitably raise revenues,' " such as additional budget restrictions, the repeal of tax credits, and the raising of taxes. *Id.* at 1107; see also *Donohue v Paterson*, 715 F Supp 2d 306 (ND NY, 2010).

Further, many courts have held that impairments of government employee contracts by the state that have indefinite application clearly violate the Contracts Clause. *Opinion of the Justices*, 364 Mass 847, 864; 303

---

[8] Indeed, it was only as a result of our decision to strike down 2010 PA 75 that the Legislature undertook its responsibility to consider alternative and constitutional funding mechanisms, such as the voluntary system implemented by 2012 PA 300.

NE2d 320 (1973) (striking down legislation increasing present employees' contributions to retiree benefits without an increase in the subject employees' own retirement benefits as "presumptively invalid" under the Contracts Clause); *Singer v City of Topeka*, 227 Kan 356, 369; 607 P2d 467 (1980) (holding that a statute mandating increase in public employees' contributions to their retirement plan without a commensurate increase in benefits "is an unconstitutional impairment of contract rights"); *Marvel v Dannemann*, 490 F Supp 170, 177 (D Del, 1980); *Hickey v Pittsburgh Pension Bd*, 378 Pa 300, 310-311; 106 A2d 233 (1954); *Allen v City of Long Beach*, 45 Cal 2d 128, 130-133; 287 P2d 765 (1955).

For these reasons, we conclude that 2010 PA 75, from its effective date until the completed transition to a voluntary system, violated US Const, art I, § 10 and Const 1963, art I, § 10.

### III. TAKINGS CLAUSE

Under the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Am V, "[t]he government may not take private property for public use without providing just compensation to the owner." *AFT Mich II*, 497 Mich at 216. The federal constitutional provision applies to the states through the Fourteenth Amendment, US Const, Am XIV. *Id.* at 217. Here, the plaintiff-employees' salaries are specific funds in which they unquestionably had a property interest. See *Sims v United States*, 359 US 108, 110; 79 S Ct 641; 3 L Ed 2d 667 (1959) (stating "it is quite clear, generally, that accrued salaries are property").

There is no doubt that during the relevant time frame, 3% of plaintiff-employees' wages were "taken" in the dictionary-definition sense of the word. The state

does not dispute that the school districts were taking possession of wages that, by contract, belonged to plaintiffs and were sending them to state-mandated funds as *employer* contributions. The question, however, is whether that action constituted a "taking" as it has been defined for purposes of the Fifth Amendment and its Michigan constitutional counterpart. We conclude that it did.

It is well settled that when the government directly seizes property in which a person has a property interest, a Fifth Amendment taking occurs, requiring the government to pay just compensation. However, takings cases regarding a direct seizure of property typically involve real property and the exercise of eminent domain. Takings jurisprudence also commonly deals with claims that governmental regulatory actions impose such limits on the use of property that the government's actions amount to a taking.

Defendants argue that the confiscation or seizure of money, as opposed to physical property, cannot constitute a taking. Defendants point out that several courts have held that the general imposition of a monetary assessment by the government does not raise Fifth Amendment concerns. See, e.g., *McCarthy v City of Cleveland*, 626 F3d 280 (CA 6, 2010). The law is, however, equally clear that when the government does not merely impose an assessment or require payment of an amount of money without consideration, but instead asserts ownership of a specific and identifiable "parcel" of money, it does implicate the Takings Clause. Indeed, the United States Supreme Court has termed such actions "per se" violations of the Takings Clause. *Brown v Legal Foundation of Washington*, 538 US 216, 235; 123 S Ct 1406; 155 L Ed 2d 376 (2003). In *Brown*, the Court held that when the government asserted a

right to control the interest on lawyer trust accounts, even where such amounts were *de minimis*, it constituted an unconstitutional taking. *Id.* We applied this principle in *Butler v Mich State Disbursement Unit*, 275 Mich App 309; 738 NW2d 269 (2007). In *Butler*, Judge SAAD, writing for the Court, found an unconstitutional taking of property when the state disbursement unit that collects and disburses child support payments was depositing interest on the amounts awaiting disbursement into the state treasury. *Id.* at 310-312. The amount in question was merely 83 cents, and it could certainly be argued that the state could reasonably assess such a sum to pay for the collection service that benefited the children and custodial parent. See *id.* at 311-312. However, because the money was part of a definable and distinct parcel of money in which the eventual recipient had a property interest, we held that it could not be taken without payment of just compensation. See *id.* at 313-314.[9]

In *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155, 156-158; 101 S Ct 446; 66 L Ed 2d 358 (1980), a Florida county court retained the interest from a fund in its custody intended for payment of Webb's creditors. The Supreme Court held that the Florida statute authorizing the retention of the interest "has the practical effect of appropriating for the county the value of the use of the fund for the period in which it is held . . . ." *Id.* at 164. Further, the interest could not be treated as a fee for the use of the court because another statute specifically provided for a court fee based on

---

[9] In *Brown*, the government was not required to pay compensation because the clients could not have earned any interest if they had deposited the funds on their own. *Brown*, 538 US at 239-240. Similarly, in *Butler*, no compensation was ordered because the government's administrative costs were greater than the plaintiff's accrued interest, and the plaintiff's net loss was therefore zero. *Butler*, 275 Mich App at 313.

the size of the fund deposited with the court. *Id.* "To put it another way: a State, by *ipse dixit*, may not transform private property into public property without compensation . . . ." *Id.*[10]

Defendants rely on two cases from the United States Court of Appeals for the Federal Circuit as support for their position, but neither case provides such support. In *Adams v United States*, 391 F3d 1212, 1214 (CA Fed, 2004), the federal government had concluded that certain federal law enforcement personnel were administrative employees and, therefore, were not entitled to overtime pay under the Fair Labor Standards Act (FLSA), 29 USC 201 *et seq.* The employees sued under the FLSA and also asserted that the government's failure to pay those sums constituted a taking. The *Adams* court held that an action to enforce pay-

---

[10] In *Eastern Enterprises v Apfel*, 524 US 498, 503-504; 118 S Ct 2131; 141 L Ed 2d 451 (1998), the plaintiff alleged that the Coal Industry Retiree Health Benefit Act, 26 USC 9701 *et seq.*, violated the Takings Clause because it required the plaintiff to pay premiums into a fund to cover benefits for retirees the plaintiff had not employed. The Supreme Court found this to be unconstitutional. Four of the justices concluded that 26 USC 9701 *et seq.* violated the Takings Clause, *id.*, while Justice Kennedy, in an opinion concurring in the judgment and dissenting in part, reached his conclusion under the Due Process Clause, *id.* at 539, 547. However, the concerns raised by Justice Kennedy regarding the applicability of the Takings Clause do not arise in the instant case. In his opinion, Justice Kennedy stated:

> The Coal Act does not appropriate, transfer, or encumber an estate in land . . . , a valuable interest in an intangible . . . , *or even a bank account or accrued interest.* The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply *or the property it uses to do so.* [*Id.* at 540 (emphasis added).]

That is by no means the case here. Section 43e of 2010 PA 75 confiscated a specific fund, i.e., plaintiff-employees' paychecks, and removed 3% of the property before allowing them to take possession of their property.

ment of a statutory obligation for payment, unlike a *contract* for payment, does not establish a vested property right, without which a takings claim cannot arise. *Id.* at 1223. In *Adams*, the plaintiffs put the cart before the horse by arguing that failure to pay overtime constituted a taking before any right to that overtime was determined to exist. *Id.* at 1221-1222. This is not the case here because plaintiff-employees had a contract-based property right in their own wages.

*Kitt v United States*, 277 F3d 1330, 1336-1337 (CA Fed, 2002) is similarly inapposite because it involved only a general obligation to pay money under a disputed provision of the tax code. The government did not assert ownership of any particular property, and the court relied on that very point to reject the takings claim, noting that "[i]n some situations money itself may be the subject of a taking, for example, the government's seizure of currency or its levy upon a bank account. . . . In the present case, however, the government did not seize or take any property of the Kitts. All it did was to subject them to a particular tax to which they previously had not been subject. That government action did not constitute a taking of the amount of the tax they had to pay." *Id.* at 1337.

Accordingly, we hold that 2010 PA 75 violated the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Ams V and XIV.

IV. SUBSTANTIVE DUE PROCESS

The Fourteenth Amendment to the United States Constitution and Const 1963, art 1, § 17 guarantee that no state shall deprive any person of "life, liberty or property, without due process of law." Textually, only procedural due process is guaranteed by the Fourteenth Amendment;

however, under the aegis of substantive due process, individual liberty interests likewise have been protected against certain government actions regardless of the fairness of the procedures used to implement them. The underlying purpose of substantive due process is to secure the individual from the arbitrary exercise of governmental power. [*People v Sierb*, 456 Mich 519, 522-523; 581 NW2d 219 (1998) (quotation marks and citations omitted).]

In other words, "[t]he essence of a claim of violation of substantive due process is that the government may not deprive a person of liberty or property by an *arbitrary* exercise of power." *Landon Holdings, Inc v Grattan Twp*, 257 Mich App 154, 173; 667 NW2d 93 (2003).

Under 2012 PA 300, no employee is required to contribute to a retirement healthcare system. See MCL 38.1391a(1) through (4). Under the 2010 act, employees were required to do so. Under both acts, the employees have no vested right to retirement healthcare benefits. See *Studier*, 472 Mich at 658-659.[11] Under 2012 PA 300, any contributing employee subject to the 3% deduction in MCL 38.1343e is legally guaranteed compensation if he or she later does not qualify for the benefit, but that was not true under 2010 PA 75. See MCL 38.1391a(8). Despite the state's attempt to conflate the two acts, it is clear that one is consistent with substantive due process and the other is not.

---

[11] In its supplemental brief, the state appears to suggest that it intends to now direct the use of the funds differently. However, these vague assurances in its brief are not binding on the state, do not have the force of law, and are wholly irrelevant to the constitutional question before us. The state does not refer us to any case holding that an unconstitutional statute should not be struck down because the state's brief offers a nonbinding, nonspecific assurance that it will try to minimize the unconstitutional effects of the statute. The issue before us is whether 2010 PA 75 was constitutional prior to the effective date of 2012 PA 30. If, as we conclude, it was not, then the collection of the subject funds was unlawful, and the funds must be returned.

Defendants argue that the present case is analogous to *Mich Mfr Ass'n v Workers' Disability Compensation Bureau Dir*, 134 Mich App 723, 726-727; 352 NW2d 712 (1984), in which this Court upheld a statute requiring all employers in the state to contribute to a fund to help defray the costs of workers' disability compensation for the logging industry. However, that case considered only whether the statute was enacted for a proper purpose and did not address whether it met the second prong of the constitutional test. *Id.* at 733-735. Moreover, the statute related to the broad policy objectives of the workers' compensation system that affect every worker and employer in the state. Workers' compensation legislation was adopted 100 years ago to create a system to share risks and to provide for the limited, but prompt, compensation of injured workers. In addition to obtaining general insurance or insuring themselves, all employers in the state may be required to contribute to specialized funds, such as the Second Injury Fund; the Silicosis, Dust Disease, and Logging Industry Compensation Fund; and the Self-Insurers' Security Fund. See MCL 418.551. These assessments are part of a statewide economic regulatory system, and contributions to the funding of that system are required of all employers in the state. The statute in *Mich Mfr* represented a small modification in an overall system of sharing risks intended to assure stability in the industrial marketplace.

The instant case is wholly different. Payment of healthcare benefits owed by the government to a particular set of its retired employees is not analogous to the maintenance of a statewide risk-sharing system to assure market and economic stability for the private sector. Rather, it is a question of various levels of government meeting their own fiscal obligations. Defendants posit no evidence or even argument to suggest

that the funding of these retirement benefits could not have been satisfied by measures that do not raise due-process concerns.[12] The mechanism defined in Section 43e of 2010 PA 75 was *neither* one involving general taxation for a general fund with specific uses of the monies later determined by the Legislature *nor* one imposing a fee for service to the payee. It was also not a mechanism that required individuals to fund benefits that they themselves had a vested right to receive. For these reasons, we conclude that 2010 PA 75 was unreasonable, arbitrary, and capricious and violated the state and federal Due Process Clauses, Const 1963, art 1, § 17 and US Const, Am XIV, § 1.

### V. CONCLUSION

We conclude that 2010 PA 75, as it existed from its effective date until the effective date of 2012 PA 300, was unconstitutional because it violated (1) the Contracts Clauses of the state and federal Constitutions, Const 1963, art 1, § 10 and US Const, art I, § 10; (2) the Takings Clauses of the state and federal Constitutions, Const 1963, art 10, § 2 and US Const, Ams V and XIV; and (3) the guarantees of substantive due process in the state and federal Constitutions, Const 1963, art 1, § 17 and US Const, Am XIV, § 1. Accordingly, we affirm the trial court's orders granting summary disposition or partial summary disposition in favor of plaintiffs in each of the cases before us and remand the case to the trial court, which shall direct the return of the subject funds, with interest, to the relevant employees. We do not retain jurisdiction.

BECKERING, J., concurred with SHAPIRO, P.J.

---

[12] It is clear that such measures, however, exist. See 2012 PA 300 (curing the constitutional deficiencies in 2010 PA 75).

SAAD, J. (*concurring in part and dissenting in part*). I concur with the majority's conclusion that none of the issues before us has been rendered moot by the Michigan Supreme Court's decision in *AFT Mich v Michigan*, 497 Mich 197; 866 NW2d 782 (2015). However, I respectfully disagree with the majority's view that § 43e of 2010 PA 75 is violative of the Contracts Clauses of the Michigan and United States Constitutions, US Const, art I, § 10 and Const 1963, art 1, § 10, the Takings Clauses of the Fifth Amendment and Const 1963, art 10, § 2, and the Due Process Clauses of the Fourteenth Amendment and Const 1963, art 1, § 17. Accordingly, just as I dissented from the majority's decision in *AFT Mich v Michigan*, 297 Mich App 597; 825 NW2d 595 (2012), vacated 498 Mich 851 (2015), I again dissent from the majority's decision here that the mandatory contributions at issue are unconstitutional.

## I. NATURE OF THE CASE

In 1974 PA 244, the Michigan Legislature amended the Public School Employees Retirement Act, 1945 PA 136, to provide, on or after January 1, 1975, healthcare benefits for retired employees of the Michigan public schools. The act provided that the Michigan Public School Employees' Retirement System (MPSERS) would pay healthcare premiums for retired employees and their dependents under any group health plan authorized by the retirement commission. MCL 38.325b(1). In 1980, the Legislature enacted the Public School Employees Retirement Act of 1979, 1980 PA 300, MCL 38.1301 *et seq.*, setting forth the healthcare coverage provision in MCL 38.1391(1). Pursuant to MCL 38.1341, public schools must contribute to MPSERS a percentage of the total amount of their payroll to

pay the cost of healthcare premiums for retirees and their dependents. In other words, Michigan taxpayers have, for years, paid for public school employees' retiree healthcare benefits.

Over the years, the number of retiree participants in the MPSERS program has grown significantly and, therefore, so has the expense to the taxpaying public, which knows little about this unseen, but enormous, cost to the public education system. Indeed, Phillip Stoddard, Director of the Office of Retirement Services of the Michigan Department of Technology, Management, and Budget, estimated that for the year beginning October 1, 2010, the cost of healthcare for retirees and their dependents would exceed $920,000,000. Thus, it now costs school districts (meaning taxpayers) almost a billion dollars each year for retiree healthcare alone. Faced with these unsustainable, increasing costs, the Legislature has passed various amendments to increase the copays and deductibles that retirees pay for their healthcare. These modifications that require retired public school employees to contribute to their healthcare costs have survived constitutional challenge from education workers. Indeed, our Supreme Court has ruled that the Legislature created and may revoke this taxpayer-funded benefit and that retiree healthcare benefits are not a constitutionally protected contract right, nor a vested right under the Michigan Constitution.

With the enactment of § 43e of 2010 PA 75, codified at MCL 38.1343e,[1] the Legislature required current public school employees to not only pay copays and deductibles upon retirement, but also pay dollars di-

---

[1] Of course, 2012 PA 300 later modified MCL 38.1343e, but my citation of MCL 38.1343e in this opinion will refer only to the version enacted by 2010 PA 75.

rectly into the program from which they will reap generous retiree healthcare benefits. Again, the public school employees object by claiming constitutional infirmities that, in truth, do not exist. I respectfully disagree with the majority's ruling because the challenged legislation is constitutional.

## II. STANDARD OF REVIEW

This Court reviews constitutional issues de novo. *Cummins v Robinson Twp*, 283 Mich App 677, 690; 770 NW2d 421 (2009). This Court also reviews de novo a trial court's decision on a motion for summary disposition. *Moraccini v Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012).

## III. IMPAIRMENT OF CONTRACT

The majority's holding that MCL 38.1343e violates the Contracts Clauses is incorrect because, as a matter of law, MCL 38.1343e has not "operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co v Spannaus*, 438 US 234, 244; 98 S Ct 2716; 57 L Ed 2d 727 (1978). Indeed, MCL 38.1343e cannot possibly implicate these constitutional provisions because it does not affect, much less impair, any contract. Simply put, to constitute an impairment of contract, there must first be a contract that is impaired. Thus, for plaintiffs to state a claim, MCL 38.1343e must have altered either a contract between the state itself and the public school employees or the public school employees' contracts with some third party. MCL 38.1343e does neither. And, because no contract has been impaired, this claim must fail.

I begin with the established principle that legislative enactments are presumed to be constitutional

absent a clear showing to the contrary. *Mich Soft Drink Ass'n v Dep't of Treasury*, 206 Mich App 392, 401; 522 NW2d 643 (1994). "The party challenging the constitutionality of legislation bears the burden of proof." *Id*. The majority holds that MCL 38.1343e violates the Contracts Clauses of the United States and Michigan Constitutions.

> This state's constitution, Const 1963, art 1, § 10, provides that "[n]o bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted," which is substantially identical to the federal constitution, US Const, art I, § 10, which provides that "[n]o state shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." Our state constitutional provision is not interpreted more expansively than its federal counterpart. [*Attorney General v Mich Pub Serv Comm*, 249 Mich App 424, 434; 642 NW2d 691 (2002).]

The constitutional prohibition on the impairment of contracts is not absolute and must be accommodated to the state's inherent police power to safeguard the vital interests of the people. *Health Care Ass'n Workers Comp Fund v Bureau of Worker's Compensation Dir*, 265 Mich App 236, 240-241; 694 NW2d 761 (2005).

> A three-pronged test is used to analyze Contract Clause issues. The first prong considers whether the state law has operated as a substantial impairment of a contractual relationship. The second prong requires that legislative disruption of contractual expectancies be necessary to the public good. The third prong requires that the means chosen by the Legislature to address the public need be reasonable. In other words, if the impairment of a contract is only minimal, there is no unconstitutional impairment of a contract. However, if the legislative impairment of a contract is severe, then to be upheld it must be affirmatively shown that (1) there is a significant and legitimate public purpose for the regulation and (2) that the means

adopted to implement the legislation are reasonably related to the public purpose. [*Id.* at 241 (citations omitted).]

In addition, the inquiry under the first prong regarding whether the state law substantially impairs a contractual relationship "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen Motors Corp v Romein*, 503 US 181, 186; 112 S Ct 1105; 117 L Ed 2d 328 (1992).

First, under the Michigan Supreme Court's ruling in *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642; 698 NW2d 350 (2005), the public school employees have no contract with the state for retiree healthcare benefits, nor do the public school employees have vested rights in retiree healthcare benefits. In *Studier*, the Court held that MCL 38.1391(1) does not create a contract with public school retirees for retiree healthcare benefits. The plaintiffs, six public school retirees, argued that increases in their prescription drug copayments and deductibles violated US Const, art I, § 10 and Const 1963, art 1, § 10, both of which prohibit a law that impairs an existing contractual obligation. *Studier*, 472 Mich at 647-648. The Supreme Court noted that, in general, "one legislature cannot bind the power of a successive legislature." *Id.* at 660. This principle can be limited where it is in tension with the constitutional prohibitions against the impairment of contracts. *Id.* at 660-661. However, "such surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments." *Id.* at 661. Thus, a strong presumption exists that statutes do not create contractual rights. *Id.* Absent a clear indication that the Legislature intended to bind itself contractually, a

law is presumed not to create contractual or vested rights. *Id*. To form a contract, the language of a statute must be plain and susceptible of no other reasonable construction than that the Legislature intended to bind itself. *Id*. at 662. Absent an expression of such an intent, "courts should not construe laws declaring a scheme of public regulation as also creating private contracts to which the state is a party." *Id*.

Applying these principles, the *Studier* Court concluded that the plaintiffs had "failed to overcome the strong presumption that the Legislature did not intend to surrender its legislative powers by entering into a contractual agreement to provide retirement health care benefits to public school employees." *Id*. at 663. "Nowhere in MCL 38.1391(1), or in the rest of the statute, did the Legislature provide for a written contract on behalf of the state of Michigan or even use terms typically associated with contractual relationships, such as 'contract,' 'covenant,' or 'vested rights.' " *Id*. at 663-664. Had the Legislature intended to surrender its power to amend the statute to remove or diminish the benefits provided, it would have done so explicitly. *Id*. at 665.

Therefore, *Studier* is directly controlling here, and no contracts entitling plaintiff-employees to receive retiree healthcare benefits exist. Accordingly, there are no contracts with the state that can be impaired.

Second, the collective bargaining agreements (CBAs) between the public school employees and various school districts are not even touched, much less impaired. Though the plaintiffs in Docket No. 303704 argue that their breach-of-contract count is based on CBAs with their local school districts entitling them to compensation at rates established in the agreements,

in their complaint, they did not allege that any CBAs existed or that such agreements formed the basis of the breach-of-contract count, and they did not attach any contracts to their complaint.[2] Further, the state is not a party to the CBAs and cannot be bound by them. *Equal Employment Opportunity Comm v Waffle House, Inc*, 534 US 279, 294; 122 S Ct 754; 151 L Ed 2d 755 (2002); *Baraga Co v State Tax Comm*, 466 Mich 264, 266; 645 NW2d 13 (2002).

In any case, obviously, the CBAs do not address the retiree healthcare system because this is a benefit created by the state. By virtue of MCL 38.1343e, the state required public school employees to contribute money to help defray the cost of retiree healthcare benefits. This statutory mandate is between the state and each worker, and this has nothing to do with any contract. Regardless of the wage levels negotiated in CBAs for principals, teachers, or noninstructional workers, those levels are not affected. If, for example, a school district has contracted with a teacher to pay him or her $80,000 a year, the state's mandate that the employee contribute 3% under MCL 38.1343e does not alter the school district's contractual obligation. Indeed, the state Legislature could change the mandate to 4% or 1%, and the school district would nevertheless be required by contract (CBA) to pay the teacher $80,000 a year. MCL 38.1343e simply sets forth a mechanism to ensure that each member of MPSERS makes this contribution by requiring school districts to

---

[2] Plaintiffs in Docket No. 303704 note that an employment contract necessarily exists for every employee who performs services in exchange for compensation regardless of whether there was a CBA and, thus, that the failure to plead the existence of CBAs was not fatal to plaintiffs' claims. However, plaintiffs did not merely fail to allege that any CBAs existed, they failed to allege that *any* employment contract for wages was impaired by the operation of MCL 38.1343e.

deduct the contribution from the member's pay and submit it to the retiree healthcare system. But the particular method is quite apart from the terms of any labor agreement, and indeed, the state could have enforced this mandate by a lump sum or periodic payments made directly by each member. That the state chose a paycheck deduction method simply does not convert a permissible legislatively mandated contribution into an unconstitutional impairment of contract. Clearly, this case concerns the state's demands or financial assessment upon each public school employee and has nothing to do with any contract between each employee and the state or a third party. Accordingly, this constitutional theory to challenge MCL 38.1343e should be rejected.[3]

## IV. TAKINGS CLAUSES

I also dissent from the majority's holding that MCL 38.1343e effectuates a taking under the United States and Michigan Constitutions. Quite simply, MCL 38.1343e does not effectuate a taking of private property for which the government must give just compen-

---

[3] It is not clear to what extent the majority relies in its discussion in Parts II, III, or IV of its opinion on its assertion earlier in Part I that the mandatory deductions were unconstitutional not by virtue of their mandatory nature but because the "contributions were to a system *in which the employee contributors have no vested rights.*" Nevertheless, the majority cites no authority for this novel proposition. If this were true, then many other legislative enactments would be deemed unconstitutional. Though many examples exist, one need look no further than the United States Medicare system, in which one must contribute through payroll deductions for healthcare for when the person eventually attains the age of 65. Thus, under the majority's view, Congress's choice to fund Medicare though payroll deductions would be unconstitutional because a contributing worker may never become vested in any Medicare benefits. But as already noted, I find no support in the law for this proposition.

sation. Further, no caselaw holds that a "taking" occurs when the Legislature requires a public school employee to contribute money as a condition for receiving benefits in a state-created retirement healthcare program that was designed for the benefit of the employee.

US Const, Am V provides that private property shall not "be taken for public use, without just compensation." This prohibition applies against the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155, 160; 101 S Ct 446; 66 L Ed 2d 358 (1980); *K & K Constr, Inc v Dep't of Natural Resources*, 456 Mich 570, 576 n 3; 575 NW2d 531 (1998). Also, Michigan's Constitution provides that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2. The Takings Clauses do not prohibit the taking of private property; rather, they place a condition on the exercise of that power. *First English Evangelical Lutheran Church of Glendale v Los Angeles Co*, 482 US 304, 314; 107 S Ct 2378; 96 L Ed 2d 250 (1987); *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 261; 792 NW2d 781 (2010). "This basic understanding of the [Fifth] Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English*, 482 US at 315.

Here, plaintiffs did not seek "just compensation" for the taking of property arising from an otherwise proper governmental interference. Rather, they alleged that MCL 38.1343e is unconstitutional as applied to them and sought a declaratory ruling to that effect. The trial court granted the requested relief,

ordering defendants to "cease and desist from enforc-
ing or implementing MCL 38.1343e and from deduct-
ing 3% of members' compensation" in addition to
requiring defendants to return, with interest, the con-
tributions already deducted. This declaratory ruling
invalidating the statute was not an award of just
compensation for a taking effectuated by an otherwise
proper governmental action. Therefore, the relief re-
quested and granted in these cases is not that contem-
plated under the Takings Clauses, and the rulings
should be reversed.

The majority's application of the Takings Clauses to
plaintiffs' claims is legally unsupportable. Again, re-
quiring a monetary contribution to a retiree healthcare
plan does not trigger the clauses because no constitu-
tionally protected property interest is invaded. The
percentage deductions from plaintiff-employees' com-
pensation are not physical appropriations of property.
Money is fungible, and, quite simply, it is artificial to
view the deductions as a taking of property requiring
just compensation. *United States v Sperry Corp*, 493
US 52, 57-58, 62 n 9; 110 S Ct 387; 107 L Ed 2d 290
(1989). The payroll deductions are merely the Legisla-
ture's chosen means to effectuate the employees' obli-
gation under MCL 38.1343e to contribute to their own
retirement system in which, under existing law, MCL
38.1391, they will participate upon retirement.

I recognize that, in limited situations, a specific fund
of money may be considered property for Takings
Clause purposes, *Webb's Fabulous Pharmacies*, 449 US
at 155-156, but no such fund exists here. Further, it is
well established that a specific property right or inter-
est must be at stake in order to find a regulatory
taking. See *Eastern Enterprises v Apfel*, 524 US 498,
541-542, 544-546; 118 S Ct 2131; 141 L Ed 2d 451

(1998) (Kennedy, J., concurring in the judgment and dissenting in part). Justice Kennedy noted that although the statute at issue in that case imposed a financial burden, it did so without operating on or altering an identified property interest. *Id.* at 540.

> The [statute] does not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so. [*Id.*]

In *Eastern Enterprises*, Justice Kennedy would have held that the Takings Clause did not apply. *Id.* at 547-550. Furthermore, four other justices agreed with Justice Kennedy that the Takings Clause did not apply because the case involved "not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties." *Id.* at 554 (Breyer, J., dissenting). Justice Breyer noted that in *Webb's Fabulous Pharmacies*, the monetary interest at issue "arose out of the operation of a specific, separately identifiable fund of money. And the government took that interest for itself." *Id.* at 555.[4]

---

[4] And a point the majority avoids is that, on the basis of the analysis expressed by the five justices in *Eastern Enterprises*, lower federal courts have repeatedly held that the imposition of an obligation to pay money does not constitute a taking of private property. See *Adams v United States*, 391 F3d 1212, 1225 (CA Fed, 2004) ("We decline to treat a statutory right to be paid money as a legally-recognized property interest, as we would real property, physical property, or intellectual property."); *Commonwealth Edison Co v United States*, 271 F3d 1327, 1340 (CA Fed, 2001) ("[W]hile a taking may occur when a specific fund of money is involved, the mere imposition of an obligation to pay money, as here, does not give rise to a claim under the Takings Clause of the Fifth Amendment."); *Parella v Retirement Bd of Rhode Island Employ-*

The majority labors to find a taking by denominating money as property, despite contrary law. The majority reasons that increasing the dollars a retiree must pay is different from requiring current public school workers to contribute money to pay for current retirees who, incidentally, may have been coworkers yesterday and whom current workers may join tomorrow. Regardless, of course, this distinction has no relevance because it is a retiree healthcare system in which all may share and to which the Legislature has said all must contribute.

Again, MCL 38.1343e states a condition that, after the effective dates of the statute, public school employees must contribute money to a program the Legislature created for those employees upon retirement. Thus, any property interests in the wage levels contained in plaintiffs' respective CBAs were not *retroactively* affected. See *McCarthy v City of Cleveland*, 626 F3d 280, 286 (CA 6, 2010), and cases cited therein. Further, unlike in *Webb's Fabulous Pharmacies* and *Phillips v Washington Legal Foundation*, 524 US 156; 118 S Ct 1925; 141 L Ed 2d 174 (1998), no extraction of interest generated in a specific fund of money has occurred. The essence of plaintiffs' claim is that the state may not take future wages established by their CBAs. Though this is a fallacy because the state demands payment from each worker irrespective of

---

ees' *Retirement Sys*, 173 F3d 46, 50 (CA 1, 1999). In *McCarthy v City of Cleveland*, 626 F3d 280, 286 (CA 6, 2010), the court held "that the Takings Clause 'is not an appropriate vehicle to challenge the power of [a legislature] to impose a mere monetary obligation without regard to an identifiable property interest,' " quoting *Swisher Int'l, Inc v Schafer*, 550 F3d 1046, 1057 (CA 11, 2008). The *McCarthy* court noted that although some lower federal courts have followed the *Eastern Enterprises* plurality's takings analysis, those courts "have done so only where a specific private property interest is *retroactively* affected." *McCarthy*, 626 F3d at 285-286.

any negotiated wage levels, if there is a remedy, the proper remedy lies in contract, not takings, and a valid takings claim will lie only when the property rights exist independently of the claimants' so-called contracts with the government. *Niagara Mohawk Power Corp v United States*, 98 Fed Cl 313, 315 (2011); see also *Peick v Pension Benefit Guaranty Corp*, 724 F2d 1247, 1276 (CA 7, 1983); *Klamath Irrigation Dist v United States*, 67 Fed Cl 504, 534 (2005), mod on other grounds by 68 Fed Cl 119 (2005). Importantly, however, the fact that a contract theory may not yield a recovery or provide a full remedy in a given case " 'does not give life to a takings theory.' " *Niagara Mohawk*, 98 Fed Cl at 316, quoting *Home Savings of America, FSB v United States*, 51 Fed Cl 487, 495-496 (2002). In other words, that a Contracts Clause claim provides no relief does not resurrect an equally spurious takings claim.

### V. SUBSTANTIVE DUE PROCESS

I also dissent from the majority's holding that the plaintiffs in Docket No. 303702 established that MCL 38.1343e is unconstitutional under the Due Process Clauses of the Fourteenth Amendment and Const 1963, art 1, § 17. Because the Takings and Contracts Clauses provide explicit textual sources of constitutional protection regarding the type of governmental conduct at issue (but provide no relief for the reasons already stated), plaintiffs are precluded from asserting generalized substantive due-process claims. That the majority holds otherwise is clearly contrary to our constitutional jurisprudence. *Sacramento Co v Lewis*, 523 US 833, 842; 118 S Ct 1708; 140 L Ed 2d 1043 (1998). The clause should not be invoked "to do the work" of other constitutional provisions, even when they offer a plaintiff no relief. *Stop the Beach Renour-*

*ishment, Inc v Fla Dep't of Environmental Protection*,
560 US 702, 720-721; 130 S Ct 2592; 177 L Ed 2d 184
(2010) (plurality opinion by Scalia, J.). The plaintiffs in
Docket Nos. 303704 and 303706 expressly alleged
contract and takings claims. The complaint in Docket
No. 303702 alleges only a substantive due-process
claim, but the label placed on a claim is not dispositive.
*Adams v Adams (On Reconsideration)*, 276 Mich App
704, 710-711; 742 NW2d 399 (2007). Instead, "the
gravamen of an action is determined by reading the
complaint as a whole." *Id.* Because the underlying
allegations are that MCL 38.1343e operates to extract
a percentage of plaintiff-employees' compensation, the
claims fall within the explicit sources of protection
provided by the Takings or Contracts Clauses. Resort
to the generalized notion of substantive due process is
thus improper. *Cummins*, 283 Mich App at 704, citing
*Lewis*, 523 US at 842.

Furthermore, a proper review under the applicable
standards reveals that plaintiffs' claims are without
merit. Both the Michigan and United States Constitu-
tions prohibit the state from depriving any person of
life, liberty, or property without due process of law.
Specifically, the Michigan Constitution provides the
following:

> No person shall be . . . deprived of life, liberty or prop-
> erty, without due process of law. The right of all individu-
> als, firms, corporations and voluntary associations to fair
> and just treatment in the course of legislative and execu-
> tive investigations and hearings shall not be infringed.
> [Const 1963, art 1, § 17.]

As our Supreme Court has noted, "the term 'due
process' encompasses not only procedural protections,
but also contains a 'substantive' component that pro-
tects individuals against 'the arbitrary exercise of

governmental power.' " *AFT Mich*, 497 Mich at 245, quoting *Bonner v City of Brighton*, 495 Mich 209, 223-224; 848 NW2d 380 (2014). When a law is challenged on substantive due-process grounds and the law does not infringe on any "fundamental rights," i.e., "the substantive liberties that are deemed 'implicit in the concept of ordered liberty,' " our review is that of rational basis. *AFT Mich*, 497 Mich at 245; see also *Conlin v Scio Twp*, 262 Mich App 379, 390; 686 NW2d 16 (2004). In other words, the plaintiff has to "prove that the challenged law is not 'reasonably related to a legitimate governmental interest.' " *AFT Mich*, 497 Mich at 245, quoting *Bonner*, 495 Mich at 227.

As illustrated by our Supreme Court, this is a very high burden:

> "Rational basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with 'mathematical nicety,' or even whether it results in some inequity when put into practice." *Crego v Coleman*, 463 Mich 248, 260; 615 NW2d 218 (2000). Rather, it tests only whether the legislation is reasonably related to a legitimate governmental purpose. The legislation will pass "constitutional muster if the legislative judgment is supported by any set of facts, either known or which could reasonably be assumed, even if such facts may be debatable." *Id.* at 259-260. To prevail under this standard, a party challenging a statute must overcome the presumption that the statute is constitutional. *Thoman v Lansing*, 315 Mich 566, 576; 24 NW2d 213 (1946)[, overruled on other grounds by *East Grand Rapids Sch Dist v Kent Co Tax Allocation Bd*, 415 Mich 381; 330 NW2d 7 (1982)]. Thus, to have the legislation stricken, the challenger would have to show that the legislation is based "solely on reasons totally unrelated to the pursuit of the State's goals," *Clements v Fashing*, 457 US 957, 963; 102 S Ct 2836; 73 L Ed 2d 508 (1982), or, in other words, the challenger must "negative every conceivable basis which might support" the legislation. *Lehn-*

*hausen v Lake Shore Auto Parts Co*, 410 US 356, 364; 93 S
Ct 1001; 35 L Ed 2d 351 (1973). [*TIG Ins Co, Inc v Dep't of
Treasury*, 464 Mich 548, 557-558; 629 NW2d 402 (2001).]

The majority remarkably asserts that MCL
38.1343e is "unreasonable, arbitrary, and capricious,"
and thereby not rationally related to a legitimate
governmental interest.[5] Yet, our Supreme Court clearly
articulated a rational basis for MCL 38.1343e when it
upheld the constitutionality of 2012 PA 300:

> The state's purpose advanced by the challenged portions
> of 2012 PA 300—implementing a fiscally responsible sys-
> tem by which to fund public school employees' retiree
> healthcare—is unquestionably legitimate. It is entirely
> proper for the state to seek the continuation of an impor-
> tant retirement benefit for its public school employees
> while simultaneously balancing and limiting a strained
> public budget. The means used by the state—the retiree
> healthcare modifications made by 2012 PA 300—are also
> reasonably related to this purpose. It is altogether reason-
> able for the state to choose to maintain retiree healthcare
> benefits for all of its current public school retirees, and it
> is equally reasonable for the state to choose to maintain
> this program for current public school employees. More-
> over, because the Legislature has deemed it fiscally un-
> tenable for the state to place the entire burden of provid-
> ing these benefits on the taxpayer, it is also reasonable
> that the state would choose to have current public school
> employees assist in contributing to the costs of this pro-
> gram. If the state requires additional financial support to

---

[5] The majority also seems to shift the burden onto defendants when it
states that "[d]efendants posit no evidence or even argument to suggest
that the funding of these retirement benefits could not have been
satisfied by measures that do not raise due-process concerns," but this
misconstrues where the burden lies. Under rational-basis review, the
burden is on the party challenging the law. See *Shepherd Montessori Ctr
Milan v Ann Arbor Charter Twp*, 486 Mich 311, 319; 783 NW2d 695
(2010); *People v Idziak*, 484 Mich 549, 570; 773 NW2d 616 (2009); *TIG
Ins Co*, 464 Mich at 557-558.

maintain the public school employees' retiree healthcare system, which class of persons is more appropriate to assist in maintaining the fiscal integrity of this program than the participants themselves? We do not believe that the state or federal Constitutions require Michigan taxpayers to fund the entire cost of a retirement benefit for a discrete group of public employees. The state is not generally constrained from modifying its own employee benefits programs to accommodate its fiscal needs. [*AFT Mich*, 497 Mich at 247-248.]

Notably, from the Supreme Court's rationale, the voluntary or mandatory nature of the contributions is not relevant. Whether analyzed under 2012 PA 300 or 2010 PA 75, the state has an "unquestionably legitimate" interest in "implementing a fiscally responsible system by which to fund public school employees' retiree healthcare." *Id.* at 247. Further, under 2010 PA 75, every public school employee contributed to the system because every public school employee had the potential to obtain retiree healthcare benefits. Accordingly, it is entirely "reasonable that the state would choose to have current public school employees assist in contributing to the costs of [the] program." *Id.* at 248. Certainly, mandatory contributions to the retiree healthcare system are a "fiscally responsible system by which to fund public school employees' retiree healthcare." *Id.* at 247. Again, the fact that there may have been better or less intrusive ways to accomplish this does not somehow transform the law into an unconstitutional deprivation of substantive due process. See *TIG Ins Co*, 464 Mich at 557; *Crego*, 463 Mich at 260.

Accordingly, I would reverse the trial court's grant of summary disposition to plaintiffs on the substantive due-process claims.

VI. CONCLUSION

To discharge their solemn duty under the Constitution, courts must invalidate clearly unconstitutional legislation but must also defer to the Legislature when the public policy is one that may offend the litigants, but not the Constitution. Here, because (1) the challenged public policy does not even touch upon, much less impair, contracts, (2) no property is taken by the state in the sense contemplated by the Fifth Amendment, and (3) the Legislature had a rational basis for enacting 2010 PA 75, it would have been prudent and in keeping with our Court's limited charge under the Constitution to uphold this legislation as constitutional.[6]

---

[6] Additionally, assuming MCL 38.1343e is unconstitutional, I would not summarily order the specific remedy of returning the retained funds as the majority does, especially when the parties themselves have not briefed this particular issue. Instead, I would remand to allow the trial court to determine the proper measure of damages in light of the retiree healthcare components and the nature of the specific constitutional infirmity.